**HAITIAN REFUGEE CENTER, et al., Appellants**

v.

**James S. GRACEY, Admiral/Commandant, United States Coast Guard, et al.**

No. 85–5258.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1986.

Decided Jan. 9, 1987.

As Amended Jan. 9, 1987.

Marvin E. Frankel, New York City, with whom Charles Gordon, Washington, D.C., was on the brief, for appellants.

Lauri Steven Filppu, Deputy Director, Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., and David V. Bernal, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

William A. Bradford, Jr. and David W. Burgett, Washington, D.C., were on the brief for amicus curiae, Amnesty Intern. U.S.A., urging reversal.

Roberts B. Owen and Carlos M. Vazquez, Washington, D.C., were on the brief for amicus curiae, Intern. Human Rights Law Group, urging reversal.

Ralph G. Steinhardt, Washington, D.C., was on the brief for amicus curiae, United Nations High Com'r for Refugees, urging reversal.

Steven R. Shapiro was on the brief for amici curiae, American Civil Liberties Union, et al., urging reversal.

Before EDWARDS, BORK and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge BUCKLEY.

Opinion concurring in part and dissenting in part filed by Circuit Judge HARRY T. EDWARDS.

BORK, Circuit Judge:

Appellants, the Haitian Refugee Center ("HRC" or "Center") and two of its members brought this action to challenge the United States' program of interdicting on the high seas vessels carrying undocumented aliens attempting to enter the United States. Such aliens are returned to the country from which they came. Appellants seek declaratory and injunctive relief. The district court dismissed the complaint for failure to state a claim upon which relief can be granted. We affirm because we conclude that appellants lack standing to sue. Though the Center has alleged sufficient injury, neither the HRC nor its members have established the causation required by separation of powers principles for article III standing. In addition, we hold that the Supreme Court's prudential rules preclude appellants' attempts to assert the legal rights and interest of the interdicted Haitians.[1]

## I.

On September 29, 1981, "having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States," the President proclaimed that: "The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens." Proclamation No. 4865, 46 Fed. Reg. 48,107 (1981), *reprinted in* 8 U.S.C. § 1182 app. at 993 (1982).

On the same date, the President issued an executive order directing the Secretary of State to enter into "co-operative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea." Exec. Order No. 12,324, 46 Fed.Reg. 48,109 (1981), *reprinted in* 8 U.S.C. § 1182 app. at 992–93 (1982). On September 23, 1981, the United States and Haiti entered into such an arrangement. *See* Interdiction Agreement, Sept. 23, 1981, United States-Haiti, T.I.A.S. No. 10,241. Under the agreement, Haiti authorized United States authorities to board Haitian flag vessels on the high seas and make certain inquiries regarding the condition and destination of such vessels and the status of those on board. If a violation of United States law or an appropriate Haitian law is discovered, the vessel and the persons aboard may be returned to Haiti. The

1. The judgment of this court is that the judgment of the district court is affirmed. Since the only rationale for reaching that result upon which two members of the court agree is that expressed in Part III A 2, concluding that the individual appellants lack article III standing, and Part IV of this opinion, concluding that all appellants lack prudential standing, these parts are the opinion of the court.

United States agreed to the presence of a representative of the Haitian Navy aboard any United States vessel engaged in the interdiction program. The agreement also provides that it is "understood that the United States, having regard for its international obligations pertaining to refugees, does not intend to return to Haiti any Haitian migrants the United States determines qualify for refugee status." Finally, the Government of Haiti agreed that all Haitians returned to the country who are not traffickers in illegal migration will not be subject to prosecution for illegal departure.

The Executive Order directed the Secretary of Transportation to order the Coast Guard to interdict "any defined vessel carrying [undocumented] aliens." The defined vessels include vessels from foreign nations with which the United States has arrangements authorizing it to board such vessels. The Secretary of Transportation was also ordered to direct the Coast Guard "[t]o return the vessel and its passengers to the country from which it came, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist." Though the Coast Guard was to carry on the interdiction program *only* outside the territorial waters of the United States, the Executive Order provides that "no person who is a refugee will be returned without his consent" and that the Attorney General, in consultation with the Secretaries of State and Transportation, shall take appropriate steps "to ensure the fair enforcement of our laws relating to immigration ... and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland."

To implement the arrangement with Haiti, INS officials were assigned to the Coast Guard vessels engaged in the interdiction program. The INS developed unpublished, informal guidelines setting forth the procedures to be followed during interdiction operations. *See* INS Role in and Guidelines for Interdiction at Sea, Joint Appendix ("J.A.") at 55–57. The guidelines provide that if it is deemed safe and practicable by the commanding Coast Guard officer, each person aboard the interdicted vessel shall be interviewed to determine his or her name, nationality, documentation and reasons for leaving Haiti. The INS official is directed to be "watchful for any indication (including bare claims)" that a passenger may qualify for refugee status. If the official finds such an indication, an additional individual interview is held. If the interviewee indicates that he has a bona fide claim to refugee status, then the individual must be taken to the United States to present his claim.

The interdiction program began in October, 1981. Since then, over 78 vessels carrying more than 1800 Haitians have been interdicted. The government states that it has interviewed all interdicted Haitians and none has presented a bona fide claim to refugee status. Accordingly, to date all interdictees have been returned to Haiti.

## II.

Appellants sought two forms of relief: (1) an injunction permanently enjoining the Coast Guard and the INS from continuing the interdiction program, and (2) a judgment declaring the interdiction program illegal. *See* Amended Complaint for Declaratory and Injunctive Relief ("Complaint") at 20, J.A. at 23. The complaint contains four counts. Count I asserts that the interdiction program violates the rights of the interdicted Haitians under the Refugee Act of 1980 ("Refugee Act"), Pub.L. No. 96–212, 94 Stat. 102, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1253(h) (1982). Complaint at 13–15, J.A. at 16–18. Count II states that the actions of "interdicting, detaining, and forcibly returning" the interdictees to Haiti "were taken by the defendants in excess of their constitutional and statutory authority," and that these actions were taken "in violation of standards of due process defined by Congress in the Refugee Act and the Immigration and Nationality Act and therefore without

due process of law guaranteed by the Fifth Amendment." Complaint at 15–16, J.A. at 18–19. Count III alleges that the interdiction program violates the United Nations Protocol Relating to the Status of Refugees ("Protocol") and the Universal Declaration of Human Rights ("Declaration"). *See* Complaint at 16–18, J.A. at 19–21. Count IV asserts that the interdiction program violates the Extradition Treaty between the United States and Haiti, 34 Stat. 2858, and the extradition statute, 18 U.S.C. § 3181 *et seq.* (1982). *See* Complaint at 18–19, J.A. at 21–22.

The government defendants moved to dismiss "on the grounds that [the district court] lack[ed] jurisdiction over the subject matter, that the case is not justiciable under the 'political question' doctrine, that plaintiffs lack standing, and that plaintiffs have failed to state a claim upon which relief can be granted." J.A. at 26. The court granted the motion on the last ground, specifically rejecting the contention that the plaintiffs lacked standing to sue. *See Haitian Refugee Center v. Gracey,* 600 F.Supp. 1396, 1401–03 (D.D.C. 1985).

On the merits, the district court determined at the outset that the President possesses statutory and constitutional authority to conduct the interdiction program, citing 8 U.S.C. §§ 1182(f), 1185(a)(1) (1982) and the President's inherent constitutional power over immigration. 600 F.Supp. at 1399–1400. The court then held that the Refugee Act and the Immigration and Nationality Act provide no grounds for relief because "those acts only establish procedures guaranteed to aliens within the United States." *Id.* at 1404. The court dismissed plaintiffs' due process claim, concluding that "the interdicted Haitians have no Fifth Amendment rights." *Id.* at 1405. Nor did the court find any grounds for relief in the Protocol or the Declaration since the former is not self-executing and the latter is merely a nonbinding resolution. *Id.* at 1405–06. Finally, the district court concluded that the extradition treaty and statute provide relief only to Haitians in the United States. *Id.* at 1406.

Appellants appeal the dismissal of their complaint, renewing the claims they put forward below. The government seeks affirmance on several alternate grounds: (1) that the appellants lack standing, (2) that the claims present nonjusticiable "political questions," or (3) that the district court correctly determined that the President possesses sufficient statutory and constitutional authority to conduct the interdiction program and that the program violates none of the laws cited by the appellants.

## III.

It should be said at the outset that the law of standing remains uncertain and unsettled in some of its major branches. This opinion attempts to discern and apply themes that underlie the Supreme Court's more recent decisions in this field. It may be that the doctrine enunciated creates discontinuities with older precedent or with other aspects of standing law. The resolution of such discontinuities, if such there be, is not a task for this court, however. The Supreme Court appears to be in the process of reworking the concept of standing and what it has done so far requires, or at least counsels, the result here reached.

Whether appellants satisfy the constitutional requirements for standing to challenge the interdiction program is considered first. Appellants' ability to meet the prudential standing requirements is considered separately below.

To satisfy article III's "case" or "controversy" requirement, a litigant must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote and citations omitted). There are, therefore, three ele-

ments to article III standing. The first is an injury of the sort which the law will recognize. The other two are stated as varieties of causation: that the injury was not only caused by the action challenged but can be alleviated by that action's cessation.

A.

1. The HRC has alleged an injury of the sort that satisfies article III. Its complaint alleges that the HRC's "purpose, as set forth in its by-laws, is to promote the well-being of Haitian refugees through appropriate programs and activities, including legal representation of Haitian refugees, education regarding legal and civil rights, orientation, acculturation, and social and referral services." Complaint at 10, J.A. at 13. The complaint also alleges that "[t]he HRC has been directly injured by the interdiction program in that its organizational purpose has been thwarted." Complaint at 15, J.A. at 18. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court held such allegations sufficient to establish injury in fact. In *Havens,* Housing Opportunities Made Equal ("HOME"), an organization operating a housing counseling service, sued Havens Realty Corp. for allegedly engaging in racial steering practices in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3604 (1982). HOME alleged that it "'has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services'" and that it "'has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices.'" 455 U.S. at 379, 102 S.Ct. at 1124. The Court considered such injury to the organization's activities, along with "the consequent drain on the organization's resources," to be "concrete and demonstrable" and "far more than simply a setback to the organization's abstract social interests." *Id. Havens* thus indicates that the HRC has alleged article III injury.[2]

The same conclusion cannot be reached with respect to appellants Edouard Franck and Carlo Dorsainville, two individual members of the HRC. They challenge the interdiction program on the same grounds, and

2. At least one circuit has held that an organization must prove a drain on its resources in order to "come within the *Havens* formula." *See Cleburne Living Center v. City of Cleburne,* 726 F.2d 191, 203 (5th Cir.1984), *aff'd,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Though the HRC did not allege a drain on its resources, our cases apparently have not required such allegations to find injury in fact. *See, e.g., Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937–38 (D.C.Cir.1986). But, contrary to the assertion in Judge Edwards' concurrence, the HRC may not allege the drain on its resources from conducting this litigation as injury in fact. This position, which would enable every litigant automatically to create injury in fact by filing a lawsuit, has been expressly rejected by the Supreme Court: Article III injury does not arise from "an injury that is only a by-product of the suit itself" but "requires an injury *with a nexus to the substantive character* of the statute or regulation at issue." *Diamond v. Charles,* — U.S. —, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986) (emphasis added) (litigant's liability for attorney's fees not article III injury).

Though the HRC's alleged injury thus appears to meet the article III requirement under *Havens,* the injury nonetheless may be a "generalized grievance" insufficient to support the Center's standing under the "prudential principles that bear on the question of standing." *See Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. The Court did not consider this question in *Havens* since it held that the statute under which suit was brought conferred standing to the full limits of article III and thus precluded application of the prudential barriers. *See Havens,* 455 U.S. at 372, 102 S.Ct. at 1120. It is well established that a bare assertion that the government is engaging in illegal or unconstitutional activity does not allege injury sufficient to confer standing. *See Valley Forge,* 454 U.S. at 489 n. 26, 102 S.Ct. at 768 n. 26. In addition, it is doubtful that simply alleging an *intention to engage in counseling that would be* impaired by such activity could suffice to overcome an otherwise applicable generalized grievance objection since such an allegation could be made by virtually any litigant wishing to evade the generalized grievance limitation. Nevertheless, whether the HRC's alleged injury is a mere generalized grievance need not be decided since the Court's cases are less than entirely clear in this area and the discussion of the other standing requirements suffices to deny the Center's standing.

seek the same relief, as the HRC.[3] The individual appellants allege that their "associational rights ... have been injured [by the interdiction program]." Complaint at 15, J.A. at 18. This allegation, in the absence of any substantive first amendment claim, is insufficient to establish the requisite injury.

In *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Supreme Court considered, and rejected, the claim that the government's refusal to permit Ernest E. Mandel, a well-known advocate of economic, governmental, and international doctrines of world communism, to enter the United States was a violation of the first amendment rights of United States citizens who invited Mandel to speak at universities and other forums in the United States. Though the Court's opinion does not discuss standing, and so does not constitute a precedent, *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984), it may be assumed that the plaintiffs' allegation that the exclusion "prevent[ed] [the Americans] from hearing and meeting with Mandel in person for discussions," 408 U.S. at 760, 92 S.Ct. at 2580, satisfied the article III requirement of a distinct and palpable, not abstract or conjectural or hypothetical, injury, *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).

2. The individual appellants' alleged injury in this case is of a far different character. Appellants do not assert that they have been deprived of an opportunity to meet with a particular alien concerning a particular subject, or, for that matter, that they know, or even know of, any of the interdicted Haitians with whom they wish to associate. Rather, their claim is merely that they have been deprived of an opportunity to associate with some number of a class of unidentified aliens seeking to enter the country. In this regard, appellants' alleged injury is no different from that of any American who would enjoy meeting unidentified aliens of a particular nationality denied entry to the United States. It is unclear whether an injury so generalized and unspecific is adequate for standing purposes. The point need not be decided, however, for the individual appellants' alleged injury is insufficient for another reason.

These appellants, rather curiously, do not make a substantive claim that the interdiction program violates their first amendment rights. Instead, the complaint recites interference with HRC members' "associational rights" only to establish injury. Appellants' counsel confirmed this at oral argument. When asked whether appellants' complaint contains a first amendment claim, he first replied "no" and then explained: "We argue an associational right as part of the basis for answering the claim that we lack standing." Standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). This therefore is a complaint in which a right of association is recited as a basis for standing but no aspect of the interdiction program is alleged to violate the first amendment. A party cannot have standing on the basis of a legal right he does not claim is violated.

B.

Assuming therefore that the Center has established injury in fact, neither the HRC nor its members can establish the second and third article III requirements—that their alleged injuries fairly can be traced to the interdiction program and are likely to be redressed by a favorable decision.

3. Whether the HRC possesses standing as the representative of its members under *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) is not considered here, since two HRC members here assert standing in their own right. If they have standing, there is nothing gained by finding that the HRC also has representative standing. If the members do not have standing, then neither would the HRC in its representational capacity. *See id.* at 343, 97 S.Ct. at 2441.

The "traceability" and "redressability" requirements are closely related. *See Von Aulock v. Smith,* 720 F.2d 176, 180 (D.C. Cir.1983). "To the extent that there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright,* 468 U.S. at 753 n. 19, 104 S.Ct. at 3326 n. 19. Though the concepts of traceability and redressability may differ in some respects, they are alike in focusing on the question of causation. As will be shown, "causation" in this context is something of a term of art, taking into account not merely an estimate of effects but also considerations related to the constitutional separation of powers as that concept defines the proper role of courts in the American governmental structure.

When the Supreme Court has granted standing to a litigant who claims injury to his ability to act together with a third party not before the court, the litigant typically has challenged a statute that produced injury by placing him under a legal prohibition against engaging in conduct together with the third party. This legal prohibition causes an injury to the litigant sufficient to confer standing apart from any prediction about the third party's actions. *See, e.g., Craig v. Boren,* 429 U.S. 190, 194–95, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976) (vendor granted standing to challenge statute prohibiting sale of beer to minor male customers without requirement of showing that these customers would buy absent statute); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (physicians granted standing to challenge abortion statute without requirement of showing that patients would request abortions absent statute). In this case, however, the interdiction program has not legally prohibited the HRC from contacting or counseling Haitian refugees.

In the absence of a legal prohibition on his relationship with a third party, the litigant may establish article III causation only if the governmental action he complains of has purposefully interfered with that relationship. Without a purposeful interference, by statute or by executive action, the litigant would lack article III standing no matter how copious a factual showing of causation he might make. With a purposeful interference, the litigant may obtain standing if he is able to meet the high standard of "substantial probability" that his injury from that interference be traceable and redressable by the court. In this case, the interdiction program is not aimed at preventing Haitian refugees from dealing with the HRC. The prevention of that relationship is merely an unintended side effect of the program. Accordingly, the HRC lacks article III standing to challenge the interdiction program.

This conclusion and the conceptual framework for article III causation follow directly from the separation of powers principle central to the analysis of article III in the Supreme Court's cases. No decision of the Supreme Court has been found that goes so far as to find article III caustion for injury to a litigant's relationship to a third party in the absence of a statute or executive action aimed at deterring the litigant from participating in the relationship.[4]

4. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), is an unusual situation that proves this rule. In *Singleton,* the Court found that physicians had shown article III injury and causation from a statute that denied them Medicaid reimbursement for abortions they performed. The statute both aimed at preventing the physicians from performing abortions and operated immediately and automatically on the physicians by denying them reimbursement for abortions already performed at the time they sued, obviating any need to base causation on the likelihood of any third party action, such as the patients' payment to their physicians. Compare *Singleton* with *Diamond v. Charles,* — U.S. —, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), where a pediatrician was denied standing to defend the constitutionality of an Illinois law obligating physicians performing abortions to attempt to save the lives of viable fetuses. The statute imposed no legal obligation or intended burden upon Diamond, the pediatrician. The Court, expressly distinguishing *Singleton,* found that Diamond's alleged injury—loss of business resulting from contraction of the pool of potential fee-paying

Rather, when a litigant not under a legal prohibition complains even of a directly intended impact from governmental action, the Supreme Court's decisions make it clear that a finding of causation is extremely unlikely if the causal chain involves a prediction about the independent actions of third parties.[5] For instance, in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), petitioners—persons with low and moderate incomes unable to afford housing in the town of Penfield—sought to challenge a Penfield zoning ordinance allocating 98% of the town's vacant land to single-family detached housing. Petitioners alleged that "enforcement of the ordinance against third parties—developers, builders, and the like—has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford." *Id.* at 504, 95 S.Ct. at 2208. At the outset, the Court described petitioners' obligation under article III: "to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 505, 95 S.Ct. at 2208.

The Court found the requisite causation lacking:

> Here, by their own admission, realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing.... But the record is devoid of any indication that [the actual attempts by builders to construct moderate-cost housing in Penfield], or other like projects, would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners.

422 U.S. at 505–06, 95 S.Ct. at 2208–09. It appears—at a minimum—that to establish causation petitioners would have had to point to record evidence indicating that builders had submitted proposals for planned housing that, if permitted to be built, "would be adequate, and of sufficiently low cost, to meet these petitioners' needs." *Id.* at 505 n. 15, 95 S.Ct. at 2208 n. 15. Absent such evidence, "the remote possibility ... that [petitioners'] situation might have been better had respondents acted otherwise, and might improve were the court to afford relief," *id.* at 507, 95 S.Ct. at 2209, could not support petitioners' standing.

*Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), provides an additional example. There, indigents who were denied admission to various hospitals were denied standing to challenge an IRS revenue ruling that replaced a previous ruling they claimed was required by the Internal Revenue Code. The rulings defined the circumstances under which a nonprofit hospital qualifies for favorable tax treatment as a "charitable" corporation. Under the old ruling, a hospital " 'must be operated to the extent of its financial ability for those not able to pay for the services rendered' " and must not " 'refuse to accept patients in need of hospital care who cannot pay for such services.' " *Id.* at 30, 96 S.Ct. at 1920 (*quoting* Rev.Rul. 56–185). Under the new ruling, a hospital qualified as a charitable corporation if it " 'operates a full time emergency room and no one requiring emergency care is denied treatment,' " even though it " 'otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization.' " *Id.*

patients—was based on the speculative independent action of third parties, namely, the possibilities that such fetuses would survive and then find their way as patients to Diamond. *Id.* 106 S.Ct. at 1705.

5. *Accord Mideast Systems & China Civil Constr. Saipan Joint Venture v. Hodel,* 792 F.2d 1172, 1178 (D.C.Cir.1986) ("the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied"); *Action Alliance,* 789 F.2d at 938 (causation and redressability present where "the ultimate relief appellants seek cannot sensibly be viewed as dependent upon the actions of third parties").

at 31, 96 S.Ct. at 1921 (*quoting* Rev.Rul. 69-545).

The indigents alleged that the new ruling "encouraged" hospitals to deny non-emergency room services to indigents, the "implicit corollary" of which was that a grant of the "requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would 'discourage' hospitals from denying their services to" indigents. 426 U.S. at 42, 96 S.Ct. at 1926. The Court found it "purely speculative" whether "the denial of access to hospital services in fact results from [the IRS's] new Ruling, or [whether] a court-ordered return to their previous policy would result in these [indigents'] receiving the hospital services they desire," *id.*, since the alleged injury "results from the independent action of some third party not before the court," *id.*, and "it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* at 43, 96 S.Ct. at 1926.[6]

It seems clear that the Supreme Court's decisions about causation rest upon something more than mere estimates of probabilities. If *Warth* and *Simon* were viewed as pure analyses of causation, as that term is ordinarily used, those decisions would not be entirely persuasive. In *Warth,* the zoning ordinance challenged was designed precisely to prevent construction of the kind of housing petitioners wanted, which suggests rather strongly that, but for the ordinance, some would have been built. It seems highly probable, moreover, that builders will build what is demanded. In *Simon,* it seems implausible that the denial of favorable tax treatment would not have caused some hospitals to alter their practices in order to qualify. The entire theory of the IRS rulings is that they will modify behavior. Both cases, however, indicate that the causation analysis of challenges to governmental action was influenced by considerations related to the separation of powers. Thus, *Warth* begins by stating the principles of standing relevant to petitioners' claims and notes "concern about the proper—and properly limited—role of the courts in a democratic society." 422 U.S. at 498, 95 S.Ct. at 2205. *Simon* refers to the "assigned role in our system" of the federal courts. 426 U.S. at 39, 96 S.Ct. at 1924. These observations would not be relevant if the inquiry was merely one as to statistical probability.

That the separation of powers heavily influences the causation component of standing doctrine is made even clearer by

6. *Accord Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). There, parents of black children who were attending public schools undergoing desegregation challenged as unlawful certain IRS guidelines and procedures designed to carry out the IRS policy of denying tax-exempt status to racially discriminatory private schools. The parents alleged that the guidelines and procedures were inadequate since many racially segregated private schools continued to receive tax exemptions. This diminished the plaintiffs' children's ability to receive an education in racially integrated public schools. The injury was alleged to be traceable to the challenged guidelines, and could be redressed by court order, because the receipt of tax exemptions made contributions to the schools deductible from income, and deductibility "'facilitate[s] the raising of funds to organize new schools and expand existing schools in order to accommodate white students avoiding attendance in desegregating public school districts.'" *Id.* at 746, 104 S.Ct. at 3322.

The Court found the line of causation between the IRS guidelines and desegregation of the children's schools to be "attenuated at best" since the alleged injury is "highly indirect and 'results from the independent action of some third party not before the court.'" 468 U.S. at 757, 104 S.Ct. at 3328 (*quoting Simon,* 426 U.S. at 42, 96 S.Ct. at 1926). Specifically, the Court observed:

> [I]t is entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status.

*Id.* 468 U.S. at 758, 104 S.Ct. at 3329 (citation omitted). It seems highly doubtful that any factual showing by plaintiffs would have sufficed to establish causation for such a "highly indirect" injury.

*Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). In that case, the mother of an illegitimate child sued on behalf of herself, her child, and others similarly situated to enjoin the district attorney's failure to prosecute the fathers of illegitimate children under a statute making criminal a parent's failure to provide support for his or her minor children. Texas courts construed the statute to apply only to the parents of legitimate children, and Linda R.S., an unwed mother, claimed that failure to prosecute the father of her child was a violation of the equal protection clause of the fourteenth amendment. Though the Supreme Court found that the mother was injured by the father's failure to provide support, it concluded that the necessary causal relationship was lacking. "The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative." *Id.* at 618, 93 S.Ct. at 1149. But, as the dissenting opinion emphasized, the mother had sued not only for herself and her minor daughter but on behalf of all other women and minor children who sought support. The dissent found the conclusion that the effect of coercive sanctions was "at best, ... only speculative," a "very odd statement."

> I had always thought our civilization has assumed that the threat of penal sanctions had something more than a "speculative" effect on a person's conduct. This Court has long acted on that assumption in demanding that criminal laws be plainly and explicitly worded so that people will know what they mean and be in a position to conform their conduct to the mandates of law. Certainly Texas does not share the Court's surprisingly novel view. It assumes that criminal sanctions are useful in coercing fathers to fulfill their support obligations to their legitimate children.

*Id.* at 621, 93 S.Ct. at 1150 (White, J., dissenting). The dissent was surely right in its view of causation viewed as a matter of predicting human responses to law enforcement. If the statute was deemed effective to force the fathers of legitimate children to pay support, no reason appears why it would not also be effective with respect to the fathers of illegitimate children. The majority surely understood, moreover, that its "speculativeness" argument, if taken literally, would eliminate the idea of deterrence as a support for any criminal sanctions. But the majority's rationale did not ultimately rest on causation taken as a mechanical question. The last paragraph of the majority opinion makes that clear:

> The Court's prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution. Although these cases arose in a somewhat different context, they demonstrate that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another. Appellant does have an interest in the support of her child. But given the special status of criminal prosecutions in our system, we hold that appellant has made an insufficient showing of a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws.

*Id.* at 619, 93 S.Ct. at 1149 (citations omitted). The refusal of courts to interfere with prosecutorial discretion is, as many cases state or intimate, an aspect of the separation of powers. *See United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *Newman v. United States*, 382 F.2d 479, 480, 482 n. 9 (D.C.Cir.1967); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir.1965) (en banc); *see also Nathan v. Smith*, 737 F.2d 1069, 1077–79 (D.C.Cir.1984) (Bork, J., concurring) (summarizing authorities). Causation analysis therefore must be informed by separation of powers concerns.

This conclusion is reinforced by the Supreme Court's more recent statement that the entire concept of article III standing rests on separation of powers, a statement made in the course of explaining the

"traceability" and "redressability" requirements:

> These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise.
>
> The absence of precise definitions, however, as this Court's extensive body of case law on standing illustrates, hardly leaves courts at sea in applying the law of standing.... In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases. More important, the law of Art. III standing is built on a single basic idea—the idea of separation of powers. It is this fact which makes possible the gradual clarification of the law through judicial application.

*Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3325 (citations omitted). Standing doctrine, and in particular the causation aspect of that doctrine, is thus properly understood as designed to confine federal courts to their "properly limited" function.[7] That is probably the reason for the heavy presumption that causation is too speculative if injury or redress depends upon the independent action of a third party not before the court, a presumption that in the absence of a legal prohibition can be overcome only by *both* a demonstration that the purpose of the law or governmental action was to prevent the relationship between the litigant and the third party *and* a convincing demonstration of "substantial probability" that the third party would otherwise have entered into the alleged relationship with the litigant.[8] This doctrine implements separation of powers because it is necessary to prevent the virtually limitless spread of judicial authority. "Given the complexity and interdependence of our society and governmental policies, it will often be possible to allege with some plausibility that a change in a governmental policy is likely to cause other persons or institutions to modify their behavior in ways beneficial to the plaintiff. If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable." *Northwest Airlines v. FAA,* 795 F.2d 195, 204 n. 2 (D.C.Cir.1986); *see also* Scalia, *The Doctrine of Standing As an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881, 881 (1983) (standing doctrine "crucial and inseparable element" of separation of powers principle, whose disregard will inevitably produce "overjudicialization of the processes of self-governance").

That this is in fact the Supreme Court's ultimate rationale for the line it has drawn is apparent from the reasons given by Justice O'Connor for rejecting a conclusion of causation in *Allen v. Wright:*

> That conclusion would pave the way generally for suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal

7. The term "separation of powers," it must be understood, is used here as a shorthand for what *Warth* calls "the proper—and properly limited—role of the courts in a democratic society," 422 U.S. at 498, 95 S.Ct. at 2205, a role that includes judicial respect not only for the coordinate branches of the national government but also for the other governmental members of the federal system. (*Warth* itself, after all, prevented unwarranted judicial interference with the decisions of a local zoning board.)

8. Judge Edwards objects to this formulation because he believes it inconsistent with Supreme Court precedent. He notes that in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), a seller of beer did not have to establish that, absent the challenged statute, some males in the category prohibited from purchasing would have bought beer from her. This misunderstands the position taken in this opinion. A past course of conduct, of the sort one would naturally expect to continue but for the law's intervention, will suffice to show the "substantial probability" article III requires as a factual matter. An established vendor-vendee relationship satisfies that aspect of the test. Many cases in addition to *Craig* illustrate this point. Indeed, in this case, I note that it is highly likely that Haitian refugees would continue to come to the HRC and I base that judgment of a "substantial probability" on the fact that they are alleged to have done so regularly in the past. *See infra* pp. 806–807.

obligations. Such suits, even when premised on allegations of several instances of violations of law, are rarely if ever appropriate for federal-court adjudication.

> "Carried to its logical end, [respondents'] approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action." *Laird v. Tatum,* 408 U.S. [1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)].

468 U.S. at 759–60, 104 S.Ct. at 3329. These concerns

> counsel[ ] against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties. The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3.

*Id.* at 761, 104 S.Ct. at 3330. It is for this reason that *Allen v. Wright* stressed that "the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only 'in the last resort, and as a necessity,' *Chicago & Grand Trunk Ry. v. Wellman,* 143 U.S. 339, 345 [12 S.Ct. 400, 402, 36 L.Ed. 176] (1892), and only when adjudication is 'consistent with a system of separated powers ...,' *Flast v. Cohen,* 392 U.S. 83, 97 [88 S.Ct. 1942, 1951, 20 L.Ed.2d 947] (1968)." 468 U.S. at 752, 104 S.Ct. at 3325.

Conclusions about causation are thus at least as much a matter of constitutional principle as they are estimates of probabilities. With that in mind, as well as *Allen v. Wright's* instruction to compare the allegations here with those made in prior standing cases, it is necessary next to consider whether appellants have established the requisite causation.

The injury claimed by the Center is its inability to counsel and represent the interdicted Haitians. The injury asserted by the individuals is denial of association. "[T]he question [is] whether [the injuries asserted by the HRC and its members] reasonably can be said to have resulted, in any concretely demonstrable way, from [appellees'] alleged constitutional and statutory infractions." *Warth,* 422 U.S. at 504, 95 S.Ct. at 2208. The presumption is that they cannot since appellants complain of no legal disability imposed on them. Their injuries, and the capacity of an injunction to redress those injuries, instead depend upon a prediction about the independent action of a third party not before the court—*i.e.,* whether, absent the interdiction program, at least one Haitian refugee would agree to be counseled or represented by the HRC and at least one would consent to associate with the individual appellants. If statistics were all, it would seem rather farfetched to deny the heavy probability that this would occur. That probability may be enhanced by the HRC's allegation that it "has been recognized by the INS as a source of legal counsel for indigent Haitians," Complaint at 10, J.A. at 13, and by an affidavit of the Center's executive director stating that "[t]he programs and activities of the [HRC] include legal representation of Haitians (many times at the request of the immigration authorities)." Affidavit of Father Gerard Jean-Juste at ¶ 2, Record Document No. 7, Attachment 1, at 2. Nonetheless, these factors appear not to be sufficient to confer standing. Even assuming, as we must, that INS officials previously have referred Haitians to the Center for counseling, there is no indication that such referrals will be made in the future or were made pursuant to an ongoing, official INS policy. The Supreme Court, albeit in a somewhat different context, has held that past official conduct, not taken pursuant to an official policy, provides no basis for standing to seek prospective injunctive re-

lief. *See, e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983); *Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

Moreover, as has been noted, the Supreme Court's cases demonstrate that statistical probabilities are neither the only nor the primary source of article III standing. Under these cases, appellants' showing of causation fails. The allegations that, absent the interdiction program, some Haitian refugees would have dealt with appellants in the past or would do so in the future is just as "speculative" as was causation in *Linda R.S., Warth,* and *Simon.*[9] Even the existence of an official INS referral policy would not appear sufficient to establish the requisite causation because there remains the fact that the interdiction program was not designed to interfere with HRC's counseling of Haitian refugees.[10] Like the challenge to IRS policies in *Allen v. Wright,* the challenge here to the interdiction program is brought by persons who suffered no "direct harm," 468 U.S. at 761, 104 S.Ct. at 3330, but were only adventitiously affected by the challenged action. Thus, as in *Allen v. Wright,* a court could not recognize appellants' standing in this case, regardless of the factual showing they might have made, "without running afoul of [the] structural principle [of separation of powers]." *Id.* (footnote omitted).

Appellants therefore have failed to establish the requisite causation. But because the Supreme Court has never said explicitly that the separation of powers concept leads it to deny causation where it otherwise might be found if it were a purely factual question, it is appropriate also to examine the prudential principles that bear on appellants' standing.

IV.

In addition to the article III minima,

> [s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324. These prudential requirements bear a "close relationship to the policies reflected in the Art. III requirement[s]," *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760, and thus help "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Appellants' failure to satisfy the first and third of these prudential requirements provides an additional reason why appellants lack standing to challenge the interdiction program. We first consider the HRC's attempt to assert the legal rights and interests of third parties and then turn to the zone of interests requirement.

9. Nor can the redressability requirement be met because the relief sought, if granted, would at least remove an "absolute barrier" to the alleviation of appellants' alleged injuries. We considered and rejected just this claim in *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258 (D.C.Cir.1980).

10. The suggestion in *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, that a current affidavit would have cured the causation problem in that case would not appear to apply to the present case. The zoning ordinance challenged in *Warth* was designed to prevent an economic transaction between builders and home buyers. That suggests that the affidavit requirement related to the high threshold of actual likelihood imposed by the separation of powers principle even in cases of legal disability or purposeful interference. When separation of powers indicate that courts ought not monitor an executive program merely to remedy an adventitious injury, it would be anomalous to permit that constitutional requirement to be overriden by an affidavit.

A.

With one arguable exception,[11] appellants' challenge relies exclusively on the alleged legal rights and interests of the interdicted Haitians under U.S. statutes, the U.S. Constitution and international agreements. *See supra* pp. 797–98. In the usual case, reliance on the rights of others contravenes the Supreme Court's first prudential principle "that 'the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 760 (*quoting Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205). In recent years, however, the Supreme Court has concluded that, in certain circumstances, a litigant may be given standing to assert particular legal rights of third parties.

A litigant may be "allowed [third party] standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth v. Seldin,* 422 U.S. at 510, 95 S.Ct. at 2211. If the government has directly interfered with the litigant's ability to engage in conduct together with the third party, for example, by putting the litigant under a legal disability with criminal penalties, and if a statute or the Constitution grants the third party a right to engage in that conduct with the litigant, the litigant has standing to challenge the government's interference by invoking the third party's rights. *See, e.g., Secretary of State of Maryland v. J.H. Munson Co.,* 467 U.S. 947, 954–58, 104 S.Ct. 2839, 2846–48, 81 L.Ed.2d 786 (1984) (fundraiser had standing to challenge statute imposing criminal penalty on charitable fundraisers for contracts granting them commissions greater than statutory cap by invoking client charities' first amendment rights); *Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 454–57, 50 L.Ed.2d 397 (1976) (vendor had standing to challenge statute imposing criminal penalty on vendors for sale of beer to males under 21 or to females under 18 by invoking males' equal protection rights); *Doe v. Bolton,* 410 U.S. 179, 188–89, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973) (physicians had standing to challenge statute imposing criminal penalty on physicians for performance of certain abortions by invoking patients' privacy rights).

By granting a litigant standing to invoke a third party's rights, "the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the [litigant]." *Warth,* 422 U.S. at 500–01, 95 S.Ct. at 2206.[12] *J.H. Munson Co.* further supports this explana-

11. Though it is not clear from their complaint, appellants' claim, that the interdiction program exceeds the President's statutory and constitutional authority, may assert an alleged legal right of their own—the right not to be injured by *ultra vires* executive action. *See Air Reduction Co. v. Hickel,* 420 F.2d 592 (D.C.Cir.1969).

12. Viewing third party standing as implied by specific constitutional guarantees readily explains *Cheaney v. Indiana,* 410 U.S. 991, 93 S.Ct. 1516, 36 L.Ed.2d 189 (1973), a case summarily denying a nonphysician, convicted of performing an abortion, standing to assert his patent's rights. Because the *Roe* right does not protect *non*physician-patient relationships, there was no basis for third party standing.

This view of third party standing also clarifies the duty of state courts when faced with claims of third party standing. Professor Monaghan rightly suggests that "[i]f no affirmative federal law drives the doctrine, [then] a state court's refusal to permit such a third party standing challenge [would be] an adequate and independent state ground." Monaghan, *Third Party Standing,* 84 Colum.L.Rev. 277, 294 (1984) (footnote omitted). If, on the other hand, we are correct that third party standing is implied by substantive constitutional guarantees, then the supremacy clause obligates the state courts to recognize such standing. For example, if a case like *Doe v. Bolton* arose in state court, we feel confident that the Supreme Court would not readily accept a state court's holding that, "whatever the rule in the federal courts, our established doctrine is that the physician may assert only his own rights and not the rights of his patients." *Id.* at 293. Conversely, the Supreme Court may review a case from a state court although standing would have been lacking under the Court's prudential rules if the case had been brought in a federal district court. *See City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); Monaghan, *supra,* 84 Colum.L.Rev. at 290–92.

tion. After identifying the reasons behind the prudential ban on third party standing, the Court stated: "*Within the context of the First Amendment,* the Court has enunciated ... concerns that justify a lessening of prudential limitations on standing." 467 U.S. at 956, 104 S.Ct. at 2847 (emphasis added). The Court noted that "[t]he activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents." *Id.* at 958, 104 S.Ct. at 2848. It was the danger that the restriction on fundraisers would chill the charities' free speech that justified the fundraisers' standing to assert the charities' first amendment rights. Third party standing may be proper for first amendment claims, because at least some of the rights secured by the first amendment protect the ability of persons to engage in activity with one another.

Third party standing therefore is appropriate only when the third party's rights protect that party's relationship with the litigant. Thus, a litigant may not be given third party standing to assert constitutional rights of third parties that do not protect a relationship, such as procedural due process rights. A litigant therefore could never have standing to challenge a statute solely on the ground that it failed to provide due process to third parties not before the court.

The Supreme Court's rejection of litigants' attempts to raise the fourth amendment rights of third parties further illustrates this limit. In *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), evidence of a foreign bank account was obtained by the IRS through an illegal search of a briefcase owned by defendant's banker. The Supreme Court held that the evidence could be used because the defendant "lacks standing under the Fourth Amendment to suppress the documents illegally seized from [his banker]." *Id.* at 731-32, 100 S.Ct. at 2444. Since the fourth amendment exclusionary rule, devised as a deterrent for police misconduct, does not protect interaction between the litigant and a third party, *see* Monaghan, *Third Party Standing,* 84 Colum.L.Rev. 277, 305 n. 149 (1984), a litigant may not base his standing on the third party's fourth amendment right.

Similarly, in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), a bankers' association, a bank, and bank depositors sought to challenge on fourth amendment grounds a regulation obligating financial institutions to report all currency transactions of their customers over $10,000. After denying first party standing to the litigants, the Court said, "[n]or do we think that the [bankers' association] or the [bank] can vicariously assert such Fourth Amendment claims on behalf of bank customers in general." *Id.* at 69, 94 S.Ct. at 1521. This is crucial because among the general customers were undoubtedly many that did engage in transactions required to be reported. That they would engage in such transactions with the banks was certainly as predictable as the interactions in *Bolton, Craig,* and *J.H. Munson Co.,* cited above. The only explanation for *California Bankers'* denial of third party standing, then, is that the fourth amendment provides no protection for the interaction between a depositor and his bank.

Applying the principles established by the Supreme Court's cases to the case at bar, we find two reasons why appellants lack third party standing to assert the rights and interests of the interdicted Haitians. First, appellants have not made the independent showing required for recognition of third party standing to raise the non-constitutional rights of third parties, because none of the laws that the interdiction program is alleged to violate are substantive protections of a relationship between Haitian aliens and appellants (or anyone else). The program is alleged primarily to violate such Haitians' procedural rights. Second, even if Haitians could claim a substantive right to consult with appellants, the interdiction program was

not designed to interfere with that consultation. These reasons merit a further word.

It is significant that the typical Supreme Court case recognizing third party standing involves a challenge to a statute that interferes with the litigant's protected relationship with third parties. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), a case without a majority rationale, nevertheless does not break this pattern, nor does the plurality view support appellants' standing here. In that case, physicians who regularly performed abortions for low-income women sued to enjoin the operation of a statute prohibiting the payment of Medicaid benefits to doctors for performing abortions that were not "medically indicated." Justice Blackmun, joined by three other members of the Court, allowed the physicians to assert the rights of their patients because denial of payment would interfere with women's abortion decisions. Justice Powell, also writing for three other Justices, thought the absence of a direct interference with the relationship of the physicians with their patients precluded third party standing. The decisive vote was cast by Justice Stevens, who found third party standing only because the physicians had first party standing. There was thus no majority rationale concerning the physicians' ability to assert the rights of their patients. It is worth noting, moreover, that even Justice Blackmun's *Singleton* approach provides no basis for finding third party standing on the part of either the HRC or its members. According to the plurality's approach, the statute challenged in *Singleton* was specifically intended to burden the third-party patients' relationship with their physicians. By contrast, the interdiction program was not intended to prevent the interdicted Haitians from dealing with appellants. The interference with that relationship is an unintended side effect of a program with other purposes. As shown above, allowing standing for unintended side effects of programs would involve the court in the continual supervision of more governmental activities than separation of powers concerns should permit. Should there be any doubt that this is a factor in article III analysis, it certainly appears relevant to the prudential limits to standing.

There is a second reason why appellants lack third party standing in this case: the statutes appellants seek to enforce were not intended to give them a right of action on behalf of the interdicted Haitians. As in the case of constitutional guarantees, a statute may grant the litigant a right of action amounting to third party standing. As the Supreme Court has explained:

> Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules.... [S]o long as [the art. III requirement] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.

*Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. Thus, whether a federal statute confers third party standing upon a particular litigant depends on the intent of Congress. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 535–56, 104 S.Ct. 831, 838–50, 78 L.Ed.2d 645 (1984) ("In evaluating [whether a federal statute implies a private right of action], our focus must be on the intent of Congress when it enacted the statute in question."); *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1982) (same); *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981) (same); *accord Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) ("The question of the existence of a statutory cause of action is, of course, one of statutory construction."). In this case, appellants have pointed to no evidence that Congress, in adopting the Refugee Act, the INA, and the other laws invoked by appellants, intended to grant appellants rights of action to seek relief on

the basis of the interdicted Haitians' legal rights and interests under these laws.

This court's decision in *FAIC Securities, Inc. v. United States,* 768 F.2d 352 (D.C. Cir.1985), does not alter our conclusion that appellants lack third party standing. In *FAIC Securities,* deposit brokers sued to enjoin the implementation of regulations, promulgated pursuant to the Federal Deposit Insurance Act and the National Housing Act, which would have changed existing federal insurance coverage of deposits in a way that effectively put deposit brokers out of business. The court found that the brokers had third party standing to assert the legal rights and interests of their depositors, that the depositors' interests fell within the relevant zones of interests, and that, therefore, the brokers had standing to challenge the regulations. The opinion states: "we feel constrained to follow the holdings in *Craig* and *Carey* [*v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ], which base standing upon the vendor-vendee relationship alone." 768 F.2d at 360–61. The *FAIC Securities* court, however, did not cite or discuss the Supreme Court's decisions in *Payner* and *California Bankers Association.* In those cases, analyzed above, the Court held that the same vendor-vendee relationship was insufficient to confer third party standing.[13]

### B.

The zone of interests test requires "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (*quoting Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). This requirement applies whether the litigant is asserting his own legal rights and interests, those of third parties, or both. If the litigant asserts only his own legal rights, then he must establish that his interest falls within the relevant zones of interests.[14] If the litigant asserts only the rights of third parties, then he may satisfy the zone of interests requirement by reference to the third parties' interests if the

13. We do not mean to say that the result in *FAIC Securities* was incorrect. The court's finding that the brokers satisfied article III standing requirements was sufficient to establish the broker's standing. Since the brokers were challenging the regulations as *ultra vires* the FDIA and the NHA, they were not required to establish that the interest they asserted fell within the zones of interests of those statutes. The zone of interests requirement thus was either inapposite or satisfied. *See infra* note 14. Nor was there any independent need for the brokers to establish third party standing since the legal right they asserted—the right not to be injured by unauthorized agency action—was their own. *See Air Reduction Co. v. Hickel,* 420 F.2d 592 (D.C.Cir.1969) (holding that helium producers had standing to enjoin the Secretary of the Interior from enforcing regulation requiring government contractors to purchase their helium needs from the Secretary—a regulation claimed, and held, to be in excess of statutory authority); *cf. Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir.1981) (litigant held not to have third party standing permitted to challenge as *ultra vires* copyright of government-commissioned television series).

14. Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires.* Otherwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest. For example, were a case like *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), to arise today, the steel mill owners would not be required to show that their interests fell within the zone of interests of the President's war powers in order to establish their standing to challenge the seizure of their mills as beyond the scope of those powers.

It may be that a particular constitutional or statutory provision was intended to protect persons like the litigant by limiting the authority conferred. If so, the litigant's interest may be said to fall within the zone protected by the limitation. Alternatively, it may be that the zone of interests requirement is satisfied because the litigant's challenge is best understood as a claim that *ultra vires* governmental action that injures him violates the due process clause.

court determines both that the litigant has third party standing and that the third parties' interests fall within the relevant zone of interests. *See FAIC Securities, Inc. v. United States,* 768 F.2d 352 (D.C.Cir.1985). Thus, if appellants had established third party standing, and the interdicted Haitians' interests fell within the relevant zones of interests (a question we do not consider), then the zone of interests requirement would present no barrier to appellants' standing to assert the legal rights and interests of the interdicted Haitians.[15] If the litigant asserts both his own rights and those of third parties, then he must satisfy the zone of interests test with respect to both his own interests and those of the third parties whose rights he has standing to assert.

Though we read appellants' complaint to assert only the legal rights and interests of the interdicted Haitians under the Refugee Act, the INA, the Protocol, the Declaration, the due process clause, and the extradition treaty and statute, the point is not crucial. Even if appellants alleged that the interdiction program also violates their own legal rights under these laws, appellants would lack standing to assert such rights since we conclude that appellants' interests do not fall within the zones of interests of these laws.

Despite some initial confusion, it is now the settled law of this circuit that "the 'zone' test is supposed to focus on 'the interest asserted by a party in the particular instance.'" *American Friends Service Comm. v. Webster,* 720 F.2d 29, 52 (D.C. Cir.1983) (*quoting Control Data Corp. v. Baldrige,* 655 F.2d 283, 293–94 (D.C.Cir. 1981)). Indeed, it has been almost ten years since this court originally identified, and dispelled, confusion on this topic:

> We are aware of the confusion surrounding the meaning of which interests are relevant to the zone test. Essentially, the confusion surrounds what exactly has to fall within the relevant zone: 1) the parties themselves; 2) the interests of the parties in general; or 3) the particular interest the parties are asserting in the litigation. It seems clear to us that the particular interests are the relevant interests in the context of an application of the zone standard.

*Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 142 n. 76 (D.C.Cir.1977) (citation omitted).

Thus, to satisfy the zone of interests requirement, appellants must establish that their particular interests alleged to have been injured by the interdiction program fall within the respective zones of interests intended to be protected or regulated by the Refugee Act, the Immigration and Nationality Act, the fifth amendment, the Protocol, the Declaration, the extradition treaty, and the extradition statute.

The particular interest the HRC is asserting in this litigation is its interest in counseling and representing the interdicted Haitians; the members' interest is in associating with the interdicted Haitians. It is these interests that appellants agree are injured by the interdiction program. *See* Complaint at 10, 15, J.A. at 13, 18.

Our cases establish "the appropriate test to be ... whether the complaining party has stated an interest which is arguable from the face of the statute." *Tax Analysts,* 566 F.2d at 142. The one exception to this general approach is when "the legislative history contain[s] clear evidence of

15. Though a litigant who possesses third party standing may be able to satisfy the zone of interests requirement by reference to the interests of third parties, there is no reason to suppose that a litigant who satisfies the zone of interest requirement by reference to his own interest also possesses third party standing. The latter is a separate inquiry. The only litigants who properly may assert the legal rights and interests of third parties are those who fall within one of the exceptions to the rule against third party standing, a subject taken up at Section IV.A., *supra.* That a litigant's interest falls within the relevant zone of interests is simply irrelevant to that inquiry. On the other hand, the reason that possession of third party standing may assist a litigant to satisfy the zone of interests requirement is because a litigant with such standing may assert the legal rights *and interests* of third parties and the third parties' interests may fall within the relevant zones of interests.

an intent either to allow the appellant's interests as a basis for standing or to deny standing to a party in this position." *Id.* at 143 n. 80. The provision of the Refugee Act that the interdiction program is said to violate provides:

> The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

8 U.S.C. § 1158(a) (1982). It is not immediately apparent from this language that the zone of interests Congress intended the Refugee Act to protect or regulate includes an organization's interest in representing, and its members' interests in associating with, Haitian refugees. Rather, on its face, the statute appears to regulate or protect only the interest of aliens in applying for asylum.

Our recent decision in *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931 (D.C.Cir.1986), does not change this preliminary conclusion. There, "organizations that endeavor, through informational, counseling, referral, and other services, to improve the lives of elderly citizens," *id.* at 935, challenged certain HHS regulations that made their endeavor more difficult. Though primarily focusing on injury in fact and causation, the court's opinion contains a paragraph on zone of interests:

> In addition, the interests at stake in this case satisfy the prudential standing requirement. The appellants claim that the challenged features of the HHS-specific regulations make it more difficult for the organizations to assist elderly persons to know, enjoy, and protect their rights under the [Age Discrimination Act]. Such interests as promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the "zone of interests" protected by that statute.

*Id.* at 939 (citations omitted). We have no reason to question the court's conclusion that organizations' interests in assisting the elderly to understand and assert their rights under the ADA fall within the zone of interests to be protected or regulated by the ADA. If, however, *Action Alliance* were read to mean that the zone of interests to be protected or regulated by *every* statute necessarily includes an organization's (or, there being no reason to distinguish, an individual's) interest in promoting the rights created by that statute, that dictum would not merely conflict with settled law but would render the entire concept of a zone of interest a nullity. If any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute or by a constitutional provision has an interest that falls within the zone protected or regulated by the statute or constitutional provision, then the zone-of-interest test is not a test because it excludes nothing. Indeed, such a reading would mean that this court ignores the Supreme Court's decisions that persons who have only a "generalized grievance" about the way in which government operates do not have standing. *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). That is why *Action Alliance* must be read to be compatible with the numerous decisions of this court making clear that, "in applying the zone test a court must discern whether the interest asserted by a party *in the particular instance* is one intended by Congress to be protected or regulated by *the statute under which suit is brought.*" *Control Data Corp. v. Baldrige,* 655 F.2d 283, 293–94 (D.C.Cir.1981) (footnote omitted) (emphasis added). *See American Friends Service Comm. v. Webster,* 720 F.2d 29, 50 (D.C. Cir.1983); *Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253, 259 (D.C.Cir.1983) (Ginsburg, J.); *see also Copper & Brass Fabricators Council v. Department of the Treasury,* 679 F.2d 951, 952–53 (D.C.Cir.1982); *id.* at 953 (Ginsburg,

J., concurring in the result) ("our recent decision in *Control Data Corp.*... prescribes the manner in which the 'zone of interests' test is to be applied in this Circuit"). Thus, we must determine whether the HRC's interest in counseling, and its members' interests in associating with, the interdicted Haitians are interests intended to be protected or regulated by the Refugee Act and the other laws under which the interdiction program is challenged.

We have already concluded that nothing on the face of the Refugee Act indicates a congressional intent to protect or regulate the interests asserted by appellants. The legislative history of the Act, however, does contain evidence that some members of Congress were aware of the interests of "voluntary resettlement agencies" like the HRC and that Congress recognized that United States policy toward refugees has an impact on those interests. For example, the House Report states: "Refugee resettlement in this country has traditionally been carried out by private voluntary resettlement agencies.... The Committee recognizes that the efforts of these agencies are vital to successful refugee resettlement." H.R.Rep. No. 608, 96th Cong., 1st Sess. 22 (1979). Senator Kennedy, speaking in favor of the Senate bill, observed that one consequence of the proposed legislation would be to save the volunteer agencies money since they would be "better able to plan and prepare for refugee arrivals. They are [now] plagued by the uncertain, ad hoc character of the current program." 125 Cong.Rec. 23,233 (1979). Representative Holtzman, a House sponsor of the bill, also recognized that the legislation would have a beneficial impact on the interests of volunteer agencies: "If this legislation is enacted, for the first time there will be some predictability to our Government's response to refugee problems that exist around the world. The Congress, the executive branch, and the voluntary agencies will, as a result, be able to engage in long-term planning...." *Refugee Act of 1979: Hearings on H. 2816 Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 96th Cong., 1st Sess. 1 (1979).

These remarks make it arguable that the interests of volunteer organizations are within the zone of interests protected by the Refugee Act [16] and that the interdiction program adversely affected HRC's interest. The Act could hardly improve predictability if actions taken offshore prevented the Act from being applied as intended. There is, on the other hand, a counterargument described in *Tax Analysts & Advocates:*

> Every [statute] generates consequences and various forms of impact on a wide range of valid interests held by a diverse range of parties.... But the concepts of *consequence* and *impact* are not the proper guideposts to define the relevant zone of interests
>
> ....
>
> We cannot define the zone of interests as being the equivalent in every case of the "zone of impact" or the "zone of consequences."

566 F.2d at 144 (emphasis in original).

The situation here is analogous to one in which members of Congress, during consideration of a bail reform statute, remark that clarification would enable lawyers to plan their courtroom strategies with more certainty. No one would suppose that such remarks brought lawyers within the zone of interests regulated or protected by the statute so that lawyers themselves would have standing. But we need not decide

16. This is insufficient under the Supreme Court's statement of the rule. Though the Court initially stated the test as whether the plaintiff's interest "arguably" falls within the relevant zone of interests, *see Association of Data Processing Service Orgs.,* 397 U.S. at 153, 90 S.Ct. at 829, its most recent statements of the test consistently omit the term "arguably." *See Japan Whaling Ass'n v. American Cetacean Society,* — U.S. —, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986); *Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3325; *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760. These omissions must be considered a conscious refinement of the test by the Court.

whether the HRC's interest in providing volunteer services falls within the Act's zone of interests or merely within the "zone of consequences" given our conclusion that the HRC has not established the requisite causation. It is clear, however, that nothing in the Act or its legislative history indicates that the individual appellants' interests in association with aliens comes within the zones of interests to be protected or regulated.

We next consider whether appellants' interests fall within the zone of interests to be protected or regulated by the INA and conclude that they do not. The deportation provision provides in pertinent part:

> The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this Title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h) (1982). On its face, this language evinces no intent to protect or regulate the HRC's interest in counseling, or its members' interests in associating with, interdicted Haitians. Appellants also point to the provisions of the INA establishing procedures for the exclusion of aliens. *See* 8 U.S.C. § 1226 (1982). But again, those provisions cannot be read fairly to protect or regulate the interests asserted by appellants in this case.

The provision of the INA regarding the right to counsel is subject to the same analysis. The provision states:

> In any exclusion or deportation proceedings before a special inquiry officer and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1362 (1982). The zone of interests of this provision, like the others, does not appear to protect or regulate the individual appellants' interest in associating with Haitian refugees in general. While the provision creates a right of representation for aliens to be represented in exclusion or deportation proceedings, it seems impossible that the interest of the HRC in being the representative is also within the provision's zone of interests. If that were so, any lawyer who wished to represent aliens, but who had no client, would, so far as the zone of interests test is concerned, have standing to enforce this provision. Neither party has pointed to anything in the legislative history of the INA to clarify these matters further.

We need spend little time examining whether appellants' interests fall within the zone of interests to be protected or regulated by the fifth amendment. Since the complaint simply equates due process with the procedural protections of the Refugee Act and the INA, *see* Complaint at 16, J.A. at 19, our findings concerning the zones of interests protected or regulated by those statutes require the same conclusion concerning the zone of interests to be protected or regulated by the fifth amendment, as invoked by appellants in this case.

Nor need we be detained by the Protocol, a treaty signed by the United States in 1968. Article 33 of that document provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

19 U.S.T. 6223, T.I.A.S. No. 6577. The district court held that the Protocol was not self-executing, but had been partially executed through the Refugee Act. We need not decide the point, however, because the result is not relevant to appellants' standing in this case. If the Protocol is self-executing, its language makes plain that it was not intended to regulate or protect the interests asserted by appellants. If, on the other hand, the Protocol is not self-execu-

ting and has been partially executed through the Refugee Act, we have already considered separately whether appellants' interests fall within the zone of interests of that enactment.

The complaint alleges that the interdiction program also runs afoul of the United States' Extradition Treaty with Haiti, 34 Stat. 2858, and the extradition statute, 18 U.S.C. § 3181 *et seq.* (1982). We have examined both of these laws and think it sufficient to say that there is absolutely no indication that either was intended to protect or regulate the interests asserted by appellants in this case.[17]

It is plain that the interests asserted by the individual appellants in this case do not fall within the zones of interests to be protected or regulated by the laws under which they seek to challenge the interdiction program. Appellant HRC's interests also do not fall within the zone of interest of any provision cited.

V.

Though the HRC alleged injury in fact, neither the Center nor its members established the requisite causation. Had the Center established causation, it might have had standing to challenge the interdiction program as *ultra vires* the President's statutory and constitutional authority. In no case, however, could the Center be given standing to assert the legal rights and interests of the interdicted Haitians under the laws listed in the complaint since the due process clause does not protect Haitians' interaction with appellants and the other laws fail to grant the Center private rights of action to assert such rights. Moreover, appellants lack standing to assert rights they themselves might claim under the laws listed in the complaint since their interests fall outside the zones of interests of those laws.

The district court's decision to grant the defendants' motion to dismiss is hereby

*Affirmed.*

BUCKLEY, Circuit Judge, concurring:

As the Supreme Court recently acknowledged, "the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition," and which "cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). Thus when confronted with this difficult area of constitutional law, we are invited to participate in a process of "gradual clarification ... through judicial application," with particular attention, in each case, to an "examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Id.* at 752, 104 S.Ct. at 3325.

This process will at times entail the extrapolation of evolving constitutional principles for application to novel situations. Inevitably, the occasion will arise when judges are required to go beyond explicit Supreme Court precedent, as Judge Bork acknowledges to be the case with his examination of causation. While I am fully in accord with his conclusion that the Haitian Refugee Center has failed to demonstrate article III standing, I believe an alternative analysis of the causation requirement is more readily inferred from Supreme Court precedent. Accordingly, I will limit my discussion to the constitutional element of the HRC's standing. I fully concur in Judge Bork's analysis of the individual appellants' lack of article III standing, and in his analysis of all appellants' lack of standing under prudential principles.

I.

I begin with the beginning; namely, the HRC's claim of injury. In its complaint,

17. We do not consider whether appellants' interests fall within the zone of interests to be protected or regulated by the Universal Declaration of Human Rights because it is merely a nonbinding resolution, not a treaty, adopted by the United Nations General Assembly in 1948. *See* G.A.Res. 217, 3 U.N.GAOR, U.N.Doc. 1/777 (1948).

the Center alleges that its "purpose, as set forth in its by-laws, is to promote the well-being of Haitian refugees through appropriate programs and activities, including legal representation of Haitian refugees, education regarding legal and civil rights, orientation, acculturation, and social and referral services." Complaint at 10, J.A. at 13. It further alleges that it "has been directly injured by the interdiction program in that its organizational purpose has been thwarted." Complaint at 16, J.A. at 19. These are the specific allegations on which this court must assess the Center's organizational standing. Fortunately, we are dealing with one of the rare areas of the law of standing in which a clear pattern appears to be emerging, one that finds its most recent expression by this court in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C.Cir.1986). In that case, we noted:

> The appellants before us devote themselves to the service of senior citizens and rest their claims on programmatic concerns, not on wholly speculative or purely ideological interests in the agency's action. (Citations omitted.) Their complaint identifies concrete organizational interests detrimentally affected by the particular HHS regulatory dispositions they challenge....
>
> AASC pleads the same type of injury as the plaintiffs in *Havens Realty:* the challenged regulations deny the AASC organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities. Unlike the "mere 'interest in a problem'" or ideological injury in *Sierra Club* [*v. Morton* ], 405 U.S. [727] at 735, 739, 92 S.Ct. [1361] at 1366, 1368 [31 L.Ed.2d 636 (1972) ], the AASC organizations have alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged.

*Id.* at 937–38.

This language echoes the principle laid down in *Warth v. Seldin,* to wit, that an association "may have standing *in its own right* to seek judicial relief from injury *to itself* and to vindicate whatever rights and immunities the *association itself* may enjoy." 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (emphasis added). *See Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 140–41, 71 S.Ct. 624, 632–33, 95 L.Ed. 817 (1951) ("The touchstone to justiciability is injury to a legally protected right and the right of a bona fide charitable organization to carry on its work, free from [harassment], is such a right.") (Burton, J.). *See also id.* at 183–84, 71 S.Ct. at 654–55 (The practice complained of "deprives the organizations themselves of no legal right or immunity. By it they are not dissolved, subjected to any legal prosecution, punished, penalized, or prohibited from carrying on any of their activities.") (Jackson, J., concurring).

In the instant case, the HRC does not assert that appellees have interfered with its organizational ability to provide Haitians with programs and activities of the kind described in its complaint. Therefore, because of the nature of the HRC's alleged injury, this case is clearly distinguishable from *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens,* the plaintiff organization, HOME, asserted that the challenged actions of the defendant realtor had frustrated its *operational ability* to facilitate the location and rental of suitable housing by blacks seeking its assistance. The Supreme Court agreed that HOME had incurred "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitutes far more than simply a setback to the organization's abstract social interests." 455 U.S. at 379, 102 S.Ct. at 1124 (citation omitted).

By way of contrast, the HRC makes no claim that either its organizational activities or resources have been adversely affected by the interdiction program. It is able to pursue its organizational purpose by providing extensive services, "including legal representation of Haitian refugees, education regarding legal and civil rights, orientation, acculturation, and social and

referral services," to the thousands of Haitian refugees who have already arrived in America as well as others who may continue to reach our shores despite the interdiction program.* The HRC's ability to function as an organization is not at stake.

An examination of the allegations in the complaint reveals nothing concrete to show a causal relationship between the injury claimed and the governmental action complained of. It is not as if we were dealing with a restaurant that had been cut off by a municipal roadblock from access to a portion of its potential clientele. As restaurants are organized in order to earn profits from the sale of meals and as each additional client adds to the enterprise's revenues, the owner clearly would have standing to challenge the municipality's action because of its impact on those revenues. The Center, however, was organized for a different purpose, and nothing in its complaint suggests that that purpose has been compromised by the President's interdiction order. Indeed, the HRC has not alleged that a single one of its activities has been affected by a putative decrease in the number of Haitian refugees reaching U.S. territory; a failure which suggests that its concern for the plight of Haitians intercepted on the high seas comes far closer to reflecting an abstract social interest than it does the kind of concrete associational interest addressed in *Warth* and *Action Alliance of Senior Citizens.*

In fact, the alleged injury is sufficiently insulated from the action alleged to have inflicted it that the claim may well lie on the far side of the line that divides constitutionally cognizable injury from abstraction. The Supreme Court's holding in *Allen v. Wright* is in point. In that case, the Court considered an action brought by a group of black parents and children seeking to enjoin Internal Revenue Service practices that allegedly granted tax-exempt status to racially discriminatory private schools. The plaintiffs alleged two injuries, the first of which may be described as a claim of "stigmatic injury" to blacks resulting from government discrimination on the basis of race. 468 U.S. at 754, 104 S.Ct. at 3326.

While the Court acknowledged that "this sort of non-economic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing," it cautioned that "such injury accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Id.* at 755, 104 S.Ct. at 3327. As plaintiffs had not alleged that they had suffered a stigmatic injury "as a direct result of having personally been denied equal treatment," the Court concluded that their first claim of injury was not judicially cognizable. *Id.* at 755–56, 104 S.Ct. at 3327.

In the instant case, the claim of organizational injury may be tangible enough to meet the injury prong of the constitutional test. Yet it is alleged almost as an abstraction, because the complaint omits allegation of any direct link, causal or otherwise, between the asserted harm and the challenged actions. Thus there may be grounds to question whether the Center's allegations meet the threshold constitutional requirement of standing despite the minimalist approach to injury to be found in *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

## II.

Even conceding injury, the Center must still meet the test of causation. In this case, the requisite showing of cause and effect will not be satisfied by speculation as to the statistical probability that one or more of the Haitian refugees intercepted by the Coast Guard might otherwise have appeared at the Center's door in Florida. Rather, it requires a demonstration that a

* At the inception of the interdiction program, Haitians were entering the United States illegally at an estimated rate of up to 20,000 a year. *Coast Guard Oversight—Part 2: Hearings on Military Readiness and International Programs Before the Subcomm. on Coast Guard and Navigation of the House Comm. on Merchant Marine and Fisheries,* 97th Cong., 1st Sess. 13 (1981) (statement of David Hiller, Special Assistant to the Attorney General, Dept. of Justice).

putative diminution in the number of potential clients for the HRC's services will impair its ability to provide them. This analysis falls comfortably within the conceptual framework of the Court's treatment of the second claim of injury in *Allen v. Wright.*

In support of that claim, the plaintiffs asserted that the grant of tax-exempt status to segregated private academies impeded the desegregation of public schools to the detriment of their children, who were thereby denied the advantages of an integrated education. The Supreme Court agreed that the alleged injury was judicially cognizable. 468 U.S. at 756, 104 S.Ct. at 3327. It concluded, however, that the plaintiffs had failed to establish that the injury claimed was "fairly traceable" to the practice challenged. *Id.* at 757, 104 S.Ct. at 3328.

> The diminished ability of respondents' children to receive a desegregated education would be fairly traceable to unlawful IRS grants of tax exemptions only if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration. Respondents have made no such allegation.

*Id.* at 758, 104 S.Ct. at 3328.

In the case before us, the HRC has failed to indicate how the interdiction program would make an appreciable difference in its ability to serve the Haitian refugee community. One searches the complaint in vain for a description of even a single program within the scope of its organizational purpose with which the interdiction program is ostensibly interfering. In the absence of more concrete allegations, I can discern no chain of causation between the interdiction program and a harm to the HRC's "organizational purpose," nothing to suggest that the HRC would be able to prove that any of the activities listed in its complaint has been appreciably affected by the program. Therefore I cannot conclude that the HRC has satisfied the causation requirement of article III.

This analysis is faithful to the Court's admonition to examine the complaint's allegations to determine the existence of a justiciable controversy and, more concretely, is consistent with the Court's reasoning in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). There the Court considered a challenge to a zoning ordinance of the town of Penfield, New York. Individuals of low income alleged that they had been denied affordable housing in Penfield as a result of the ordinance. While they alleged that their desire to find affordable housing was being thwarted by the ordinance, here the HRC alleges that its desire to help Haitian refugees is being thwarted by the interdiction program. The *Warth* Court denied the individual petitioners standing because they had failed, "in any concretely demonstrable way," to establish causation.

> Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield.... We find the record devoid of the necessary allegations.... [N]one of these petitioners has a present interest in any Penfield property; none is himself subject to the ordinance's strictures; and none has ever been denied a variance or permit by respondent officials. Instead, petitioners claim that respondents' enforcement of the ordinance against third parties—developers, builders, and the like—has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford. The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing.... But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

*Id.* at 504–05, 95 S.Ct. at 2208 (citations omitted). Nothing alleged by the HRC

suggests even remotely that there is *any* probability, let alone a substantial one, that the imposition or lifting of the interdiction program had or would have an appreciable impact on its activities.

III.

As this analysis falls well within the limits of recent Supreme Court precedent, I feel it represents a surer basis for affirming the Center's lack of article III standing than does Judge Bork's, relying as it does on inferences to be drawn from recent Supreme Court cases rather than on their explicit holdings. As stated at the outset, I concur in the other elements of Judge Bork's analysis of appellants' standing.

HARRY T. EDWARDS, Circuit Judge, concurring in part and dissenting in part:

In this appeal the Haitian Refugee Center, Inc. ("the HRC") and two of its members [1] challenge the legality of the seizure of certain Haitian vessels on the high seas and the forcible return of their undocumented passengers to Haiti. The HRC and two of its members allege that this official program of systematic interdiction deprives the Haitian passengers of their rights under the Constitution and laws of the United States and under international law.

The Government defendants, the United States Coast Guard ("the Coast Guard") and the Immigration and Naturalization Service ("INS"), urged the District Court to dismiss this action on the grounds that the appellants lacked standing, that the case presented a nonjusticiable political question, and that the complaint failed to state a claim upon which relief could be granted. The District Court held that the appellants had standing and that the case was justiciable, but thereafter dismissed the entire complaint for failure to state a claim. We affirm, albeit for reasons somewhat different from those enunciated by the District Court.

It is clear that the HRC has standing in its organizational capacity to bring this lawsuit on behalf of the Haitians who were forcibly returned to Haiti pursuant to the Government's interdiction program. However, while neither standing nor political question bars judicial consideration of this case, we are nonetheless constrained to conclude that the HRS has failed to state a claim upon which relief may be granted. In particular, it must be concluded that, although in recent years, Congress has extended certain statutory rights to aliens, the Haitians interdicted under the program at issue in this case are not protected by the legal provisions cited by the HRC.

At first blush, one cannot but be moved by the plight of those Haitians whose desperate situation in their homeland led them to risk their lives at sea in small boats in search of asylum in the United States. But our sympathies can provide no road map to judgment in this case. The simple reality here is that the appellants' complaint must fail because it can find no support in the cited laws or in the Constitution of the United States, nor in any principles of international law that are cognizable in this court.

I. Background

In their complaint, the appellants allege that "the human rights situation in Haiti [is] ... very grave" and that "hundreds of thousands of Haitians have fled ... to escape ... political persecution and brutality." [2] They further assert that, in the course of the past ten years, many Haitians have risked their lives in small boats in order to reach the coast of southern Florida and safety.[3] Finally, it is alleged that many of these fleeing Haitians will be subject to imprisonment and mistreatment if

1. The two member-plaintiffs are Edouard Franck and Carlo Dorsainville.

2. Amended Complaint for Declaratory and Injunctive Relief, ¶¶ 5 & 6, *reprinted in* Joint Appendix ("J.A.") 4–24.

3. *Id.* ¶ 8.

forced to return to their homeland.[4] For the purpose of ruling on the propriety of the Government's motion to dismiss, we will assume these allegations to be true.[5]

A. *The Creation of the Interdiction Program*

In 1981, President Reagan formally found that the uncontrolled migration of visaless aliens to this country was "a serious national problem detrimental to the interests of the United States." [6] Specifically, he noted that "[a] particularly difficult aspect of the problem [was] the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States." [7] Invoking both his constitutional and statutory authority, he decided that "international cooperation to intercept vessels trafficking in illegal migrants [was] a necessary and proper means of insuring the effective enforcement of our [immigration] laws." [8]

Thus, by Executive Order No. 12,324, dated September 29, 1981, President Reagan ordered the Secretary of State to enter into "cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea." [9] He ordered the Secretary of Transportation to instruct the Coast Guard to interdict "any defined vessel carrying [undocumented] aliens." [10] The Coast Guard was further directed to "return the vessel and its passengers to the country from which it came, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist." These actions were to be undertaken only *beyond* the territorial waters of the United States.[11]

The Executive Order also spoke specifically to the unique situation of those individuals who would qualify as refugees under our immigration laws.[12] It provided that "no person who is a refugee will be returned without his consent" and that the Attorney General, in consultation with the Secretaries of State and Transportation, must take any steps necessary "to ensure the fair enforcement of our laws relating to immigration ... and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland." [13]

B. *The Arrangement with Haiti*

On September 23, 1981, Haiti and the United States entered into a cooperative arrangement to prevent the illegal migration of visaless aliens to the United States.[14] The agreement provides, *inter alia,* that United States authorities may board Haitian flag vessels on the high seas for the purpose of making certain inquiries relating to the condition and destination of the vessel and the status of those on board.

4. *Id.* ¶ 9.

5. It appears that Jean-Claude Duvalier, formerly the President-for-Life of Haiti, no longer governs that country. However, the political situation in Haiti remains in a state of flux, and Government counsel did not suggest at oral argument that the interdiction program would be suspended or cancelled. Under these circumstances, it should be assumed that the general outline of the situation remains as plaintiffs have alleged and under that assumption the purely legal issues presented will be decided.

6. Proclamation No. 4865, 46 Fed.Reg. 48,107 (1981), *reprinted in* 8 U.S.C. § 1182 app. at 993 (1982).

7. *Id.*

8. *Id.*

9. Exec.Order No. 12,324, 46 Fed.Reg. 48,109 (1981), *reprinted in* 8 U.S.C. § 1182 app. at 992–93 (1982).

10. Defined vessels included "[v]essels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels." *Id.*

11. *Id.*

12. *See* 8 U.S.C. § 1101(a)(42) (1982) (defining "refugee").

13. Exec.Order No. 12,324, *supra* note 9, at 48,110.

14. Interdiction Agreement, Sept. 23, 1981, United States-Haiti, T.I.A.S. No. 10241.

If a violation of United States law or an appropriate Haitian law is discovered, the vessel and its passengers may be returned to Haiti. The government of Haiti also formally agreed that Haitians returned to that country (with the exception of the traffickers) would not be prosecuted for illegal departure. The United States further authorized a representative of the Navy of Haiti to act as liaison on any vessel engaged in the implementation of the cooperative arrangement.

Finally, within this arrangement, as in the Executive Order, the position of the refugee was singled out for differential treatment. The agreement states that it is "understood that ... the United States Government does not intend to return to Haiti any Haitian migrants whom the United States authorities determine to qualify for refugee status." [15]

### C. *The INS Implementation*

To effect the cooperative arrangement with Haiti, INS officers were assigned to Coast Guard vessels involved in interdiction operations. The INS also issued informal guidelines which govern its conduct during interdiction engagements.[16] INS officers must obtain the following information from persons on board an interdicted vessel: their names, nationality, documentation and reasons for departure from Haiti.[17] The INS officer is directed to be "watchful for any indication (including bare claims)" that an individual may qualify for refugee status. If any such indicator is present, a further individual interview is conducted. If an interviewee gives an indication that a *bona fide* claim to refugee status exists, that person's passage to the United States must be arranged so that he or she may present a claim.

The interdiction program began in October, 1981. Although more than 1,800 Haitians have been interdicted by the Coast Guard, not one, according to the Government, has demonstrated that a *bona fide* claim to refugee status might exist.[18] Thus, all of the interdictees have been returned to Haiti.

### D. *Course of Proceedings*

The original complaint in this case was filed on July 24, 1984; it was amended on September 17, 1984. The Government filed a motion to dismiss and a motion for summary judgment on the latter date. A cross-motion for summary judgment was filed by the plaintiffs on October 1, 1984. Oral argument was heard in the District Court and, on January 10, 1985, the defendants' motion to dismiss was granted. This appeal followed.

## II. Analysis

### A. *Standing*

As a threshold matter, the Government has argued that the appellants in this case lack standing. In my view, this contention is meritless because the HRC plainly has standing in its organizational capacity.

The standing inquiry involves both constitutional and prudential limitations on the exercise of federal court jurisdiction. At an "irreducible minimum," Article III of

15. *Id.*

16. INS Role in and Guidelines for Interdiction at Sea, *reprinted in* J.A. 55–57 (Sept. 24, 1982 revision, *reprinted in* Appendix D to Brief for Defendants-Appellees).

17. The guidelines also provide that each person on board an interdicted vessel will be interviewed only if it is deemed safe and practicable by the commanding Coast Guard officer. The INS asserts that on no occasion has the INS failed to interview an interdicted Haitian. *See* Declaration of Leon C. Jennings, Immigration Inspector (Oct. 9, 1984), *reprinted in* J.A. 46. The HRC points out, however, that the guidelines *permit* the interview to be omitted. This dispute as to the adequacy of the INS procedure, like others such as the presence or absence of the Haitian liaison at the interviews of the interdicted Haitians, need not be resolved because the appellants here have stated no claim that entitles these passengers to any specific procedural protections.

18. This is the figure provided to the District Court by the Government as of September, 1984. *See* Declaration of Leon C. Jennings, *supra* note 17, at 34.

the Constitution requires a party to demonstrate that he or she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,"[19] that the injury "fairly can be traced to the challenged action"[20] and that it is "likely to be redressed by a favorable decision."[21] The injuries alleged, however, need not be direct;[22] nor need they be economic in nature.[23]

The Supreme Court has also articulated certain prudential requirements that must be satisfied. First, the plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[24] Second, it is not sufficient for a party to allege only a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens."[25] Finally, a "plaintiff's complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"[26]

In the instant case, the Government contends that the HRC has failed to demonstrate any injury-in-fact and, in addition, that it has failed to satisfy the prudential requirements of standing. As will be demonstrated in detail below, these contentions are without merit.

1. *The Constitutional Requirements of Organizational Standing*

The Supreme Court has recognized that "organizations are entitled to sue on their own behalf for injuries they have sustained."[27] Organizational injuries may involve matters little different than injury to a person, and standing to protect against such injuries has been "easily recognized."[28]

The leading case in this area is *Havens Realty Corp. v. Coleman.* In that case, the Housing Opportunities Made Equal ("HOME") organization brought an action against a real estate firm under the Fair Housing Act of 1968, alleging that the firm had engaged in racial steering practices and furnished false information about the availability of housing to Blacks. HOME claimed that these practices "frustrated the organization's counseling and referral services, with a consequent drain on re-

**19.** *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). This criterion is often phrased in terms of whether the litigant has "'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

**20.** *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

**21.** *Id.; see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

**22.** *Warth,* 422 U.S. at 504–05, 95 S.Ct. at 2208; *see also United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"),* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

**23.** *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *see also SCRAP,* 412 U.S. at 686, 93 S.Ct. at 2415.

**24.** *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

**25.** *Id.*

**26.** *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)).

**27.** *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 n. 19, 102 S.Ct. 1114, 1124 n. 19, 71 L.Ed.2d 214 (1982) (citing *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211).

**28.** 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3531.9, at 604 (2d ed. 1984). *See also Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 299 n. 11, 99 S.Ct. 2301, 2309 n. 11, 60 L.Ed.2d 895 (1979) (union pursuing organizational and publicity campaigns has standing to challenge constitutionality of Arizona Agricultural Employment Relations Act).

sources." [29] The Court found "concrete and demonstrable injury to the organization's activities" in that the "steering practices [had] perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." [30] These impairments to the organization's activities were characterized as "far more than simply a setback to the organization's abstract social interests." [31]

There can be no question that, like HOME in *Havens,* the HRC has alleged injury-in-fact. The HRC is a non-profit membership corporation whose purpose, as set forth in its by-laws,[32] is to promote the well-being of Haitian refugees through social and referral services, education regarding legal and civil rights, cultural orientation, and legal representation.[33] As one federal district court has recognized, "the primary problems faced by Haitians revolve around their uncertain immigration status and therefore the work of the HRC focuses on the representation of members and prospective members before INS." [34] Indeed, the INS itself has recognized the HRC as a referral organization for Haitians in the Southern District of Florida who wish to obtain legal counsel to fight exclusion or extradition,[35] and the organization has asserted that over 20,000 Haitians "have been represented or otherwise assisted by the Center." [36] Obviously, Haitians who are interdicted cannot take advantage of the counseling, referral and legal services that the HRC holds out to them.

The HRC, like HOME, has sufficiently alleged frustration of its counseling and referral efforts and its legal representation of Haitian refugees; the interdiction program impairs its ability to carry out its central or core functions and activities. In its complaint, the HRC charges that, *because of* the interdiction program, "Haitians on the intercepted vessels are returned to Haiti within a matter of hours to face persecution," with no adequate counseling or representation from the HRC.[37] It is further claimed that, but for the interdiction program, the Haitians "would seek representation by the HRC." [38] Obviously, as noted in *Havens,* because the interdiction program has "perceptibly impaired [the HRC's] ability to provide counseling and referral services for [the Haitians], there can be no question that the organization has suffered injury in fact." [39] Furthermore, in having to pursue this litigation, the HRC's limited resources have been diverted from its main mission of counseling Haitian refugees. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to

29. 455 U.S. at 369, 102 S.Ct. at 1119.

30. *Id.* at 379, 102 S.Ct. at 1124.

31. *Id.*

32. By-Laws of the HRC, Dec. 14, 1983, Art. II, Record Document No. 7, Attachment 1, Exhibit A, at 2.

33. Amended Complaint, *supra* note 2, at ¶ 30. The HRC has brought several major lawsuits "challenging practices and procedures of the INS in processing Haitian refugee applications." *Id.*

34. *HRC v. Civiletti,* 503 F.Supp. 442, 474 (S.D. Fla.), *modified sub nom. HRC v. Smith,* 676 F.2d 1023 (5th Cir.1982).

35. Affidavit of Father Gerard Jean-Juste, Executive Director of the HRC, ¶ 2, Record Document No. 7, Attachment 1, at 1–2.

36. *Id.* HRC's membership also includes a substantial number of Haitian refugees (including many who seek political asylum) and members of the community who support the defined purposes and activities of the organization. *See* Amended Complaint, *supra* note 2, at ¶ 32; *see also HRC v. Civiletti,* 503 F.Supp. at 474.

37. Amended Complaint, *supra* note 2, at ¶ 34.

38. *Id.* ¶¶ 33 & 35.

39. *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124. The *Havens* "decision clearly supports standing based on the theory that challenged activities interfere with an organization's efforts to help others." Wright, Miller & Cooper, *supra* note 28, at 606–07.

the organization's abstract social interests." [40] And, as the Supreme Court made clear in *Havens,*

> [t]hat the alleged injury results from the organization's noneconomic interests in [promoting the well-being of Haitian refugees] does not affect the nature of the injury suffered, *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 263 [97 S.Ct. 555, 562, 50 L.Ed.2d 450] (1977), and accordingly does not deprive the organization of standing.[41]

In light of the foregoing facts, and in consideration of INS' use of the HRC as a referral organization, the agency's argument that injury to the HRC from the interdiction program is purely speculative appears rather disingenuous.

The Government makes a futile effort to find some support from the recent Fifth Circuit decision in *Cleburne Living Center v. City of Cleburne, Tex.*[42] In *Cleburne,* an organization engaged in promoting the welfare of mentally retarded persons, and favoring the development of group homes, attempted to challenge the denial of a special use permit sought by a proposed group home operator. Not surprisingly, the court held that the group's interests alone were too abstract to support standing. In particular, the court noted that the group *would have* standing "if it proved that (1) it provides counseling and referral services for mentally retarded persons seeking group homes, and (2) it has had to devote significant resources to combating the City Council's discrimination." [43] It is noteworthy that, in the instant case, the HRC has proven precisely what the Fifth Circuit found necessary to justify organizational standing in *Cleburne, i.e.,* counseling and referral services and significant expenditure of resources in pursuing Haitian refugee claims before INS and other governmental agencies.

In addition to the decision in *Cleburne,* in which the Government can find no solace, a consistent line of authority in this and other circuits buttresses the conclusion that the HRC has standing. Most recently, in *Action Alliance for Senior Citizens v. Heckler,*[44] this court held that organizations "that endeavor, through information counseling, referral, and other services, to improve the lives of elderly citizens" had successfully alleged injury to themselves:

> The appellants before us devote themselves to the service of senior citizens and rest their claims on programmatic concerns, not on wholly speculative or purely ideological interests in the agency's action. Their complaint identifies concrete organizational interests detrimentally affected by the particular HHS regulatory dispositions they challenge.[45]

Relying on *Havens,* the *Action Alliance* court concluded that "the challenged regulations deny the ... organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling and referral activities. Unlike the mere 'interest in a problem' or ideological injury in *Sierra Club,* the ... organizations have alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." [46] The organizations and factual situations in *Action Alliance* and the present case are analogous in all pertinent respects, and, furthermore, these holdings are far from unique.[47]

**40.** *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124.

**41.** *Id.* at 379 n. 20, 102 S.Ct. at 1124 n. 20.

**42.** 726 F.2d 191 (5th Cir.1984), *aff'd,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The standing question was not discussed by the Supreme Court.

**43.** *Id.* at 203.

**44.** 789 F.2d 931, 935 (D.C.Cir.1986).

**45.** *Id.* at 937 (citations omitted).

**46.** *Id.* at 938 (quoting *Sierra Club,* 405 U.S. at 739–40, 92 S.Ct. at 1368–69).

**47.** *See Community Nutrition Institute v. Block,* 698 F.2d 1239, 1253 (D.C.Cir.1983) (to obtain standing organization cannot claim only that it has an interest in "seeing" that consumers receive dairy products at the lowest possible price, but must allege that it *assists* them in doing so or that the contested regulation *impedes* it from

In short, the HRC seeks to provide counseling, referral services and legal representation to a limited and well-defined class of persons—Haitian refugees. Its history and purpose demonstrate its continuing commitment to *activities* in furtherance of its goals—activities which are frustrated by the interdiction program. The HRC has therefore successfully alleged injury-in-fact in its organizational capacity.

There can be no doubt that such injury is fairly traceable to the appellees' actions and would be cured by their cessation. The HRC has demonstrated an existing, and admittedly well-established, pattern of Haitians seeking its services. This pattern was cut off solely because of the interdiction program. No speculation is needed to say that the interdiction cut off the flow of referrals and that the relief sought would restore the flow. The only assumption required is that what happened before will continue to happen in the future in much the same way. This is not "speculative" under the case law.[48]

The majority seeks to abandon the Supreme Court's consistently articulated test of causation in favor of an entirely new test applicable only to cases such as this one. In avoiding an obvious showing of standing in this case, the majority opinion suggests that Supreme Court precedent dictates that, "[i]n the absence of a legal prohibition on his relationship with a third party, the litigant may establish article III causation *only* if the governmental action he complains of has *purposefully interfered* with that relationship." Then, the majority suggests that, even after showing purposeful interference, the litigant would only satisfy Article III if it could show a "substantial probability" that its injury is traceable to the action and redressible by the court. This is a quite extraordinary notion of "causation," both in the novelty of the majority's test and in its disregard of Supreme Court precedent.

In asserting this new test of causation, the majority cites *Warth, Simon, Linda R.S. v. Richard D.,*[49] and *Allen v. Wright.* But, as even the majority recognizes, none of these cases enunciates a "purposeful interference" test of causation. Indeed, the point is too obvious to be belabored. At best, the cases cited by the majority stand for the unexceptional point made in *Allen v. Wright* that standing is not a "mechanical exercise" and that "the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." [50] However, it would be quite astonishing to think that, with this obvious statement, the Court in *Allen v. Wright*

so doing), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *Granville House v. Department of Health and Human Services,* 715 F.2d 1292, 1297 (8th Cir.1983) (nonprofit organization whose purpose was to treat indigents who were chemically dependent was injured by classification of chemical dependency as a mental disease for purpose of denying Medicaid benefits and resultant compelled switch to treatment of *paying* patients; group was injured by having "to withdraw from its primary mission of treating the poor"); *Developmental Disabilities Advocacy Center, Inc. v. Melton,* 689 F.2d 281, 287–89 (1st Cir.1982) (nonprofit legal advocacy group for persons with developmental disabilities injured by rules limiting its access to residents at state school for the retarded); *Chicano Police Officer's Assoc. v. Stover,* 526 F.2d 431, 436 (10th Cir.1975) (organization "has a direct stake ... in challenging barriers against employment of those from whom it might well enhance its membership and resources to attain its goals"), *vacated on other grounds,* 426 U.S. 944, 96 S.Ct. 316, 49 L.Ed.2d 1181 (1976); *Scientists' Institute for Public Information, Inc. v. AEC,* 481 F.2d 1079, 1087 n. 29 (D.C.Cir.1973) (organization had standing to challenge AEC decision not to issue environmental impact statement because agency action limited organization's ability to carry out its major activity of providing information to the public).

48. For example, in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), a seller of beer challenged a law that prohibited sale to certain males but not females. The plaintiff did not have to establish that absent the statute some males would buy beer from her. The proposition is obvious. Yet, this is precisely what the majority appears to require.

49. 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

50. *Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3325.

intended to overrule all prior precedent on causation, and to embrace *sub silentio* a notion of purposeful interference. And surely *Allen v. Wright* cannot be viewed as an invitation to the lower courts to create new law on standing, especially new law that is at odds with existing Supreme Court precedent.

In the absence of any precedent to support its new test of causation, the majority looks to considerations of separation of powers. As best as I can understand the point, the majority is concerned that, since government actions are widespread and pervasive, they can have many effects on daily life. So, government farm subsidies could affect not only the price of butter, but, indirectly the price of guns, to use a classic example. However, the majority's solution is to wear a belt and suspenders. There simply is no evidence that the traditional test of causation is not sufficient to weed out insubstantial "effect" cases.[51]

In any event, it is plain that even the majority recognizes that "the Supreme Court has never said explicitly that the separation of powers concept leads it to deny causation where it otherwise might be found if it were a purely factual question." This admission alone shows that this novel view of standing cannot be adopted as the law, especially given the Supreme Court's clear and consistent articulation of a different test of causation.

In this case, the HRC has alleged an injury as a result of violations of federal laws. The court must reach these issues in order to afford the plaintiff any relief to which it may be entitled upon the presentation of a meritorious claim. Article III requires no more from a plaintiff. The HRC has established Article III standing in this case.[52]

2. *Prudential Requirements*

The Government's arguments that the HRC's claims do not meet the prudential requirements for standing center around the zone of interests test.[53] However, careful analysis of this case shows that there are three separate theories which independently support a conclusion that the

51. Two of the cases relied on by the majority, *Warth* and *Linda R.S.*, involve challenges to state action. It is thus hard to see how these cases implicate any notions of allocation of powers among the branches of federal government. *Simon* and *Allen v. Wright,* being suits challenging federal executive action, do raise separation of powers concerns. But these concerns appear to be aimed at ensuring that the exercise of the court's remedial powers will not easily or routinely interfere with efforts by coordinate branches to carry out their constitutional and statutory obligations. Moreover, "federal courts may exercise power only 'in the last resort, and as a necessity'...." *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3325 (*quoting Chicago & G.T. Ry. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892). Thus, the separation of powers concerns are really a restatement of the basic federal model of adjudication: a court reaches legal issues as a necessary incident of its duty to decide concrete disputes.

52. *Chinese American Civic Council v. Attorney General of the United States,* 566 F.2d 321, 324 & 331 (D.C.Cir.1977), cited by the Government, does not mandate a different result. In that case, the organization "ha[d] not alleged concrete injury to itself or to its members." The HRC, in contrast, has alleged injury on its own behalf. The *Civic Council* case was decided before *Havens,* and no attempt was made to allege injury to the organization or its members.

53. The zone test has provoked both confusion, *see Copper & Brass Fabricators Council, Inc. v. Department of Treasury,* 679 F.2d 951, 954 (D.C. Cir.1982) (Ginsburg, J., concurring); *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 139 (D.C.Cir.1977); *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), and criticism, *see Barlow v. Collins,* 397 U.S. 159, 167–73, 90 S.Ct. 832, 838–42, 25 L.Ed.2d 192 (1970) (Brennan, J., joined by White, J., concurring in the result and dissenting); K. Davis, Administrative Law Treatise § 24.17 (2d ed. 1983); Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief,* 83 Yale L.J. 425, 493–96 (1974). The test is not "extinct," as Professor Davis has at one point suggested. Davis, *Standing, 1976,* 72 NW.U.L. Rev. 69, 81 (1977). The Supreme Court has, however, ignored the test when its application might have yielded different results. *See* Davis, Treatise, *supra,* § 22.02–11, at 347–51 (Supp. 1982), and cases cited therein. There is no doubt, however, that it remains a prudential principle which we must apply, *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760, whatever uncertainty we feel about the precise scope of its application.

HRC's interests fall within the zones of interest of the statutory and constitutional provisions upon which it relies. As detailed below, each analysis, alone, would suffice to satisfy the zone test.

a. *Congruence of Statutory Purpose and Organizational Activities and Goals*

The HRC's interests are squarely within the zone of interests to be protected or regulated by the statutory and constitutional provisions it relies on in the present case. This court has recently noted that "[t]he zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress itself has pared back traditional prudential limitations ... by the Administrative Procedure Act...."[54] In this context the test must be given a generous scope because, as the Supreme Court has noted, the test was designed to enlarge, not diminish, the class of people with standing to protest administrative action.[55]

The Government, however, argues that the HRC is not within the zone of interests of the international obligations, statutes and constitutional provisions relied on[56]—namely, the Refugee Act of 1980[57] (and the regulations promulgated thereunder pursuant to authority granted in the Immigration and Nationality Act ("INA")),[58] the Fifth Amendment, the United Nations Protocol Relating to the Status of Refugees ("the Protocol"),[59] the Universal Declaration of Human Rights ("UDHR"),[60] the 1904 Extradition Treaty between the United States and Haiti,[61] and the federal extradition statute.[62] The Government acknowledges that the interdictees themselves would be within the relevant zones, but contends that organizations actively engaged in their aid, resettlement and legal assistance are not. The contention is not only difficult to fathom, it is wholly without support in the case law.

It is important to recall that the Supreme Court introduced the "zone of interests" test in a "trend ... toward enlargement of the class of people who may protest administrative action."[63] Although the test is admittedly ill-defined, it is noteworthy that the Court required nothing more than that the complainant's interest be *"arguably* within the zone of interests to be protected or regulated by the statute ... in question."[64] With this background, it is hardly

54. *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 357 (D.C.Cir.1985) (discussing deposit brokers' action challenging regulations of the Federal Home Loan Bank Board and the Federal Deposit Insurance Corporation as unlawful under the National Housing Act and the Federal Deposit Insurance Act).

55. *See Data Processing,* 397 U.S. at 154, 90 S.Ct. at 830.

56. The relevant "zone" for the purpose of the test is "not that of the statute or regulation *challenged,* but that of the statute or regulation which forms the *basis* of the challenge." *FAIC Securities,* 768 F.2d at 357 n. 4 (citing *Glass Packaging Institute v. Regan,* 737 F.2d 1083, 1088 (D.C.Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984)).

57. Pub.L. No. 96-212, 94 Stat. 102 (1980).

58. 8 U.S.C. § 1101 *et seq.* (1982).

59. United Nations Protocol, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267 (*entered into force with respect to the United States* Nov. 1, 1968).

60. G.A.Res. 217A, 3 U.N.Doc. A1810 (1948).

61. 34 Stat. 2858, T.S. 447 (1904).

62. 18 U.S.C. § 3181 *et seq.* (1982).

63. *Data Processing,* 397 U.S. at 154, 90 S.Ct. at 830.

64. *Id.* at 153, 90 S.Ct. at 829 (emphasis added). The majority believes that the Supreme Court has "refined" this formulation of the zone of interests test by omitting the word "arguably" in three cases: *Japan Whaling Association v. American Cetacean Society,* — U.S. —, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), *Allen v. Wright* and *Valley Forge Christian College.* In *Japan Whaling Association,* the reference occurs in a footnote relating to a portion of the opinion dealing with the political question doctrine. 106 S.Ct. at 2866 n. 4. The footnote makes clear that the plaintiffs fell within the zone of interests of the Administration Procedure Act, rendering the use of the word "arguably" superfluous in the factual context.

In both *Allen v. Wright* and *Valley Forge Christian College,* the Court found that the plaintiffs

surprising that this court has held that the zone test requires only "some indicia—however slight" that the complainant was intended to be protected, benefited or regulated by the law in question.[65] And, as noted above, we have recently recognized that, in enforcement cases like the instant one, the zone of interests test must be read expansively since Congress itself has cut back traditional prudential limitations.[66]

Under the law of this circuit, it is clear that this court consistently has held that the zone of interests test is satisfied if there is a congruence of statutory (or other legal) purpose and organizational activities and goals. Most recently, we confirmed this view in *Action Alliance of Senior Citizens,* where it was held that:

> The appellants claim that the challenged features of the HHS-specific regulations make it more difficult for the organizations to assist elderly persons to know, enjoy, and protect their rights under the [Age Discrimination Act].... Such interests as promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the "zone of interests" protected by that statute.[67]

Not only is *Action Alliance* consistent with precedent from other circuits, but the Government has also failed to cite a single case to the contrary. An example of a case supporting standing in this matter is *Granville House,* in which the Eighth Circuit held that a non-profit operator of a chemical dependency treatment center was within the zone of interests of the Medicaid statute despite the fact that the Medicaid statute was passed to benefit patients and not providers of care.[68] The court reasoned that the organization's interest was not simply financial because it also had a nonprofit corporate purpose to serve indigent and minority clients and concluded:

> This nexus between Granville's purpose and the purpose of the Medicaid statute, which is to provide Medicaid assistance to the needy, combined with Granville's economic injury, is sufficient, we believe, to confer standing in this case.[69]

Here, too, the combination of direct injury to organizational activities and a nexus between the purpose of the legal standards and the activities and goals of the organization in question suffice to confer standing on the HRC.[70] There is no intention here

lacked Article III standing to raise their claims; the zone of interests test was therefore never applied. Furthermore, the Court's dicta in these cases do not indicate a change in position from *Data Processing.* The passage in *Allen v. Wright* cites *Valley Forge Christian College* for support. *See* 468 U.S. at 751, 104 S.Ct. at 3325. The passage in *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760, *quoting Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829, is followed by a footnote. *See* 454 U.S. at 475 n. 12, 102 S.Ct. at 760 n. 12. That footnote points to passages in *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979), and *Simon,* 426 U.S. at 39 n. 19, 96 S.Ct. at 1925 n. 19, in which *Data Processing* is quoted correctly. Thus, contrary to the majority's conclusion there is no reasonable way to construe *Allen v. Wright* or *Valley Forge Christian College* as signalling a change in the zone of interests test.

65. *Autolog Corp. v. Regan,* 731 F.2d 25, 29 (D.C. Cir.1984) (quoting *Copper & Brass Fabricators Council, Inc.,* 679 F.2d at 951); *accord American Friends Service Comm. v. Webster,* 720 F.2d 29, 50 (D.C.Cir.1983).

66. *See FAIC Securities,* 768 F.2d at 357.

67. 789 F.2d at 939.

68. 715 F.2d at 1299.

69. *Id.*

70. *See also International Union of Bricklayers v. Meese,* 761 F.2d 798, 803 (D.C.Cir.1985) (union is within zone of a statutory scheme designed in part to protect employment of United States workers); *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977) ("the declaration of policy contained in the [Marine Mammal Protection] Act makes clear that [the organizations'] interests are precisely those which Congress sought to protect"), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972) (injury of a Honduran corporation challenging the rejection of its bid for a construction contract deemed within the zone of the Foreign Assistance Act because "the statute speaks to socio-economic interests of the peoples of Latin America," and the "economy of a country is dependent upon the stability of local busines [sic] enterprises such as [the corporation]").

to suggest that the mere absence of inconsistency in statutory and organizational purpose is sufficient to satisfy the zone test; rather, the point is that the test *is* met by a close fit between organizational and statutory purpose.[71] Furthermore, the constitutional injury-in-fact requirement creates an important barrier to unlimited standing; this obstacle must be surmounted even before a litigant undergoes scrutiny based on our prudential concerns. In the face of these restraints, it can hardly be said (as the Government implies) that the prevailing case law may open the floodgates to organizational standing.[72]

No one can dispute that the HRC's organizational activities and purposes revolve around precisely those interests implicated by the laws here at issue. On this basis alone, the zone requirement has been met; but we need not rest here, for there is more. The legislative history of certain of the provisions cited demonstrates clearly that the *organizational* interests in question were the express subject of congressional concern.

b. *Legislative History*

As noted above, the zone test is satisfied by the existence of some slight indicia that Congress intended to protect the interest in question. In applying the test this court may examine both the relevant statutory provisions and their legislative history.[73] Here that examination proves fruitful.

First, and most importantly, the legislative history of the Refugee Act of 1980 is clear. Congress explicitly recognized the interest of voluntary and nonprofit agencies in the refugee admissions process of the Act. Planning for, processing, and resettling refugees, Congress found, had been exceedingly difficult for both governmental and nongovernmental assistance groups due to the confused state of the law on admissions policy. The need for a consistent approach to refugee admissions and the importance of such an approach to the voluntary agencies is a major theme in the legislative history of the Act. The House Report reveals this significant legislative goal:

> To create a truly comprehensive approach to refugees, the committee has determined that any new statute must consolidate admissions and resettlement policies. Among the major consequences of our piecemeal approach to refugee crises has been the lack of coordination

71. As one commentator has explained:

> By its terms, the protective intent analysis of *Data Processing* goes beyond prior doctrine mainly in reducing a requirement that the statute which defendant is alleged to have violated be one designed to protect the class of which plaintiff is a member, to a requirement that plaintiff be merely "arguably" within the zone of interests to be protected by the statute. This change would seem to work primarily to reduce the clarity with which plaintiff must show a legislative purpose to protect those in his position: perhaps indications of mere congressional *awareness* of their interests might suffice.

Scott, *Standing in the Supreme Court—A Functional Analysis,* 86 HARV.L.REV. 645, 663 (1973) (emphasis in original).

72. Contrary to the suggestion of the majority, this test does not "render the entire concept of a zone of interest a nullity." The powerful barrier of injury-in-fact serves to prevent the court from hearing generalized grievances. Indeed, the cases cited by the majority, *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), both denied standing because the plaintiffs had failed to allege a cognizable injury.

73. This court has decided that where the particular provision in question "share[s] an identity of purpose" with the entire statutory framework, then an examination of the general structure is relevant. *See American Friends Service Comm.,* 720 F.2d at 50 n. 37 (citing *Control Data Corp. v. Baldrige,* 655 F.2d 283, 294 nn. 20 & 21 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981); *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d at 140–41). That rule manifestly has application in the instant case. Moreover, the Supreme Court, in its application of the test, has looked to the broad meaning of legislative history. *See Barlow,* 397 U.S. at 164, 90 S.Ct. at 836; *see also* Scott, *supra* note 71, at 663 (the basis for inferring legislative intent to protect was "not exactly overwhelming" in *Barlow* and *Data Processing*).

of resettlement assistance programs with refugee admissions.[74]

The Senate Report, too, noted with disapproval the "old" immigration policy of piecemeal admissions and cited the role of voluntary agencies when highlighting the desirability of a consistent policy, saying:

> [s]uch a national refugee policy is now clearly lacking, and there is too little coordination between the various branches of Government involved with refugee programs, and with the voluntary resettlement agencies.[75]

Senator Kennedy, a sponsor of the Senate bill, spoke to this same concern on the Senate floor:

> Another example [where orderly immigration policy would have saved money], referred to by the voluntary agencies in their testimony in support of the bills is the savings that could be made if the agencies were better able to plan and prepare for refugee arrivals. They are plagued by the uncertain, ad hoc character of the current program.[76]

Representative Holtzman, sponsoring member of the House bill, revealed a similar purpose in her remarks opening the House hearings:

> If this legislation is enacted, for the first time there will be some predictability to our Government's response to refugee problems that exist around the world. The Congress, the executive branch, and the voluntary agencies will, as a result, be able to engage in long-term planning, and countries of first asylum will know what to expect in terms of resettlement offers from the United States.[77]

As the House Report stated, "[r]efugee resettlement in this country has traditionally been carried out by private voluntary resettlement agencies.... The Congress recognizes that the efforts of these agencies are vital to successful refugee resettlement." [78]

The HRC "is funded through contributions from voluntary agencies," [79] in particular the National Council of Churches which testified at both the Senate and House hearings on the bill.[80] The legislative history specifically refers to the voluntary groups' efforts in counseling, referral, orientation and their "guidance on immigration matters," [81] precisely the activities engaged in by the HRC. Moreover, as noted previously, the INS itself has recognized the HRC as a referral group; and the organization has a history of litigation pertaining to its Haitian clientele's immigration matters.

The role of the voluntary agencies in the formulation of the Refugee Act was also expressly noted by Congress.[82] For exam-

74. H.R.Rep. No. 608, 96th Cong., 1st Sess. 6 (1979) [hereinafter "House Report"]. Later the Report, in discussing the Act's definition of refugee, noted that the voluntary agencies supported this provision. *Id.* at 10. *See also* S.Rep. No. 256, 96th Cong., 1st Sess. 7–8 (1979) [hereinafter "Senate Report"].

75. Senate Report, *supra* note 74, at 2.

76. 125 Cong.Rec. 23,233 (Sept. 5, 1979).

77. *Refugee Act of 1979: Hearings on H. 2816 Before the Subcomm. on Immigration, Refugees, and International Law of the Comm. on the Judiciary of the House of Representatives,* [hereinafter *"House Hearings"*] 96th Cong., 1st Sess. 1 (1979); *see also* Anker & Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980,* 19 San Diego L.Rev. 9, 43 n. 157 (1981).

78. House Report, *supra* note 74, at 22.

79. Amended Complaint, *supra* note 2, at ¶ 31.

80. *Refugee Act of 1979: Hearing on S. 643 before the Comm. on the Judiciary of the Senate,* 96th Cong., 1st Sess. 44 (1979) [hereinafter *"Senate Hearing"*] (statement of Nancy Nicolo, executive director, immigration and refugee program, Church World Service, National Council of Churches); *House Hearings, supra* note 77, at 247 (statement of Matthew R. Ginffrida, Church World Service).

81. House Report, *supra* note 74, at 22.

82. The hearings held in both Houses attest to the significance Congress attaches to the role played in national immigration policy by voluntary agency contributions and projects. The most important witness for the administration (the Refugee Act originated as an administration bill) was former Senator Dick Clark, then Ambassador at Large and U.S. Coordinator for Refugee Affairs. He had central responsibility for all refugee policy questions and had this to say about the voluntary agencies:

> Before outlining some of the key provisions in the new bill on domestic assistance, I

ple, Senator Kennedy made the following statement when introducing a panel of voluntary agency representatives, including a member of the organization that funds the HRC:

> Since my first days in the Senate—and all during the period I was chairman of the former Subcommittee on Refugees—I have known of their important work, and have sought their counsel as to how we could better meet the needs of refugees. In the drafting of the legislation before us, I also sought their views, and we look forward this morning to their testimony.[83]

Even a cursory review of the legislative history in both Houses reveals the extent of congressional dependence on the views of the voluntary agencies and nonprofit groups in the creation of the Refugee Act.[84] The bill itself was introduced only after "close consultations with ... the volunteer agencies." [85] In *Animal Welfare Institute*, this court has noted the significance of such vigorous interaction to the conclusion that a group falls within the zone of interests of a statutory provision.[86]

There are also explicit references to the work and concerns of the voluntary agencies in the legislative history of United States' adherence to the United Nations Protocol on the Status of Refugees.[87] Moreover, the Refugee Act expressly incorporated the definition of refugee and the obligation of nonrefoulment set forth in the Protocol.[88] As shown above, in the formal statutory implementation of the Protocol (*i.e.*, the Refugee Act), Congress manifest-

would like to add that none of our programs would be possible without the generous participation of a number of voluntary resettlement agencies. From the beginning, our refugee programs have been based on the assumption that refugees will have a much easier time adjusting to life in this country if they are assisted primarily by the private and voluntary sector, rather than by public assistance alone. The voluntary agencies have provided a key link in the partnership between the Government and the private sector.

*Senate Hearing, supra* note 80, at 13; *see also id.* at 17 ("we need to assure ourselves that the work of the voluntary agencies goes forward effectively and efficiently").

83. *Id.* at 44; *see also id.* at 58 ("there is great credibility in your organization's recommendations and views").

84. Two days of House testimony on the bill were devoted almost exclusively to the problems of "so-called undocumented aliens, particularly Haitians who have been arriving in Florida." In particular, testimony was elicited from an attorney directing the alien rights law project at the Washington Lawyers' Committee for Civil Rights Under Law. He testified at length about legal and practical problems resulting from the indeterminate immigration status of the Haitian and, in response to questioning, discussed in detail the relevance of a lawsuit brought by the HRC, mentioning it by name. *Refugee Act of 1979: Hearings on H.R. 2816 Before the Subcomm. on International Operations of the House Comm. on Foreign Affairs,* 96th Cong., 1st Sess. 87–88 (Sept. 19, 1979 & Sept. 25, 1979).

85. 125 Cong.Rec. 23,234 (Sept. 6, 1974) (remarks of Sen. Kennedy).

86. *See Animal Welfare Institute,* 561 F.2d at 1010 & n. 44 ("[i]ndeed the [Act] was enacted at the urging of appellant organizations" and "their representatives testified on the legislation before its passage"); *Southern Mutual Help Assoc., Inc. v. Califano,* 574 F.2d 518, 523 (D.C.Cir.1977) ("This explicit reference to nonprofit groups indicates that, while Congress clearly intended that migrant workers should benefit from the funds appropriated under this Act, it also recognized that conduit organizations such as SMHA were necessary to deliver the services contemplated.").

87. S.Exec.Rep. No. 14, 90th Cong., 2d Sess. Appendix at 5 (1968) (testimony of Mr. Lawrence A. Dawson, Acting Deputy Director, Office of Refugee and Migration Affairs, Dep't of State) ("The American Council of Voluntary Agencies, embracing 43 agencies and representing all factions and all of the organizations which carry on work on behalf of refugees and other needy people abroad, and which also serve as liaison in developing support for their efforts in this country, has unanimously endorsed U.S. accession to the protocol; and they ... have petitioned the Government on several occasions to take all necessary steps with a view to securing U.S. accession to the protocol. Mr. Chairman, in behalf of the President and the Secretary of State, I would like to reiterate their earnest hope...."); *see also* S.Exec.K, 90th Cong., 2d Sess. ix (1968) (Letter of submittal of the Protocol from the Secretary of State to President Johnson for transmittal to the Senate for advice and consent to accession) (same).

88. Senate Report, *supra* note 74, at 14–15.

ed its concern for the interests of organizations such as the HRC. Thus, these interests also fall within the zone of interests of the Protocol. A similar conclusion applies to the appellant's Fifth Amendment claim which simply equates due process with the procedural protections of the Refugee Act and the INA.[89]

In short, there is little doubt from the legislative history that the HRC's claims fall within the applicable zones of interest; the "slight indicia" test is abundantly satisfied by the organizational plaintiff in the instant case.[90]

Although (or, possibly, because) the Government is entirely unsuccessful in its effort to challenge standing under the zone of interests test, it advances an alternative argument that the HRC has improperly sought to rest its claim on the legal rights and interests of the Haitian interdictees. This argument misconceives the separate jurisprudence surrounding organizational standing. It has been noted that the relationship between the zone of interests test and third-party standing is "quite direct: the plaintiff who is outside the zone of protected interests can be seen as advancing the rights of those who are within the zone." [91] However, "[o]rganizational standing decisions present an approach quite different from the complex third-party standing decisions." [92] As we have demonstrated above, the injury to the *organization* satisfies both constitutional and prudential requirements in this case; reliance on the interest of the interdictees is unnecessary. Under *Data Processing,* the HRC was required only to show that it was arguably an intended beneficiary of the legal standards at issue, not necessarily the primary one.[93]

It follows that, in the context of organizational standing, the Government may not rely on *Warth v. Seldin,* a case in which the Supreme Court refused to award standing to an organization in its *representational* capacity because its members had asserted no palpable injury to themselves. In *Warth,* Metro-Act, one of the plaintiff organizations, alleged that 9% of its membership resided in Penfield and had been indirectly harmed by the exclusion of low and moderate income families from the town. The Court discussed Metro-Act's standing as a representative of its members in regard to this injury; it did not consider its organizational standing. Standing in a representational capacity was denied because none of Metro-Act's members alleged a palpable injury to themselves or a deprivation of their own constitutional rights. Here, in contrast, under well-accepted standards, the organization has pleaded an injury to its own interests—interests that themselves are within the zones of interest of the legal standards relied upon. The Supreme Court has made it clear that prudential concerns should not be utilized to deny standing to a plaintiff

89. As to the extradition treaty and statute, there is no basis for standing under the zone of interests test in either a congruence of statutory and organizational purpose or a legislative reference to an intent to protect organizational as well as individual interests. However, the analysis *infra* —that the HRC has standing to represent the interests of third parties, namely the interdictees—is enough to overcome the Government's prudential objection.

90. The majority argues that *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d at 144, draws a relevant distinction between being within the "zone of impact" or the "zone of consequences" of a statute and being within the zone of interests of the statute. However, the majority never decides the issue because of its earlier conclusion that the HRC had failed to establish causation. *Tax Analysts,* however, is consistent with the analysis used here. *Tax Analysts* stands for the proposition that one way of determining whether a party's interests fall within the zone of interests created by the statute is to examine the congruence between the purpose of the statute and the interests asserted by the party. 566 F.2d at 143; *see also Action Alliance of Senior Citizens v. Heckler,* 789 F.2d at 939. Under this test, the HRC falls within the zone of interests of the statutes in question.

91. Wright, Miller & Cooper, *supra* note 28, § 3531.7, at 513 n. 17.

92. *Id.* § 3531.9, at 604.

93. *See Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829; *see also Constructores Civiles de Centroamerica, S.A.,* 459 F.2d at 1189.

who makes a particularized claim on his or her own behalf simply because it also implicates the rights of others; in the instant case, unlike *Warth*, the HRC has successfully alleged a particular injury on its own behalf.[94] *Warth* is simply inapposite.

c. *Jus Tertii*[95]

Finally, on the facts of this case, the HRC has standing to assert the rights of third parties, namely the interdictees. Having satisfied the constitutional requirements for standing in its own right, the HRC may then utilize the principles of *jus tertii* and rely upon the interests of third parties—the interdictees—to fulfill the zone of interests requirement. In other words, it is assumed without any serious doubt in this case that the interdictees' interests fall within the zone of interests of the applicable laws at issue. Therefore, if the HRC may assert the interests of the interdictees, in addition to its own organizational interests, then the interdictees' interests may be relied upon by the HRC to satisfy the prudential zone of interests requirement. This so-called *jus tertii* analysis is fully supported by recent decisions of the Supreme Court and the case law of this circuit.

Generally, it is understood that a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[96] The Supreme Court, however, has recognized that

> there are situations where competing considerations outweigh any prudential rationale against third-party standing, and that this Court has relaxed the prudential-standing limitation when such concerns are present. Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of *jus tertii* standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.[97]

As shown above, the HRC has demonstrated the existence of injury-in-fact; there are numerous "practical obstacles" to the interdictees' presentation of their own claims; the HRC's interests coincide with those of the interdictees; and the HRC's historical zeal on behalf of and assistance to Haitian

94. *See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), in which a private environmental group challenged the constitutionality of the Price-Anderson Act on the grounds that the Act's liability limits violated the due process and equal protection clauses of the Fifth Amendment. The Court held that standing existed even though the claim implicated the rights of third parties residing in the vicinity of the Duke Power reactors and the relief requested was designed to benefit the general population. While noting that there were "good and sufficient" reasons to invoke prudential considerations where third parties' interests are implicated, the Court concluded that

> Where a party champions his own rights and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.

*Id.* at 80–81, 98 S.Ct. at 2634.

95. The principles of *jus tertii,* sometimes denominated third-party standing, are relevant to prudential considerations in standing analysis. *Valley Forge Christian College,* 454 U.S. at 474, 102 S.Ct. at 759.

96. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205 (citing *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943)).

97. *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984) (citing *Craig v. Boren,* 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976)). As Professor Monaghan has critically noted:

> [w]hile it may be an overstatement to say, as does Justice Brennan, that in constitutional cases, the court now has "only rarely interposed a bar to 'third-party standing,'" it is plain that the strong bias against such claims ... has substantially dissipated.

Monaghan, *Third Party Standing,* 84 Colum.L. Rev. 277, 288–89 (1984).

refugees arriving in south Florida is unquestionable. Therefore, the application of *jus tertii* is clearly warranted in this case.

The significance of *jus tertii* standing in a case of this sort was recently highlighted in a thorough and thoughtful analysis by former Judge (and now Justice) Scalia in *FAIC Securities.*[98] In that case, the court held that certain litigants who satisfy only the "core" Article III requirements for standing may then rely upon the interests of third parties to satisfy the zone of interests requirement. After discussing *Craig v. Boren,*[99] Judge Scalia notes:

> Evidently (there is no other explanation for the case), the third parties' interests could be relied upon to satisfy the "zone of interests" requirement. Later cases to the same effect are *Carey v. Population Services International,* 431 U.S. 678 [97 S.Ct. 2010, 52 L.Ed.2d 675] (1977) (involving the vendor of contraceptive devices), and *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 242–43 [103 S.Ct. 2979, 2982–83, 77 L.Ed.2d 605] (1983) (involving the provisioner of medical services to a person allegedly injured by unconstitutional state action). We have been unable to find any case in which the Supreme Court has relied upon the plaintiff's failure independently to meet the zone of interests test as the basis for its refusal to accord standing for the assertion of third-party rights.[100]

The court in *FAIC Securities* concluded that the plaintiff deposit brokers could assert the interests of depositers, and that the latter interests were clearly within the zone of the relevant statutory provisions.

The decision to permit a concededly injured party to rely upon the interests of third parties to meet prudential requirements is a function of two variables: (1) "the relationship of the litigant to the person whose right he seeks to assert," [101] and (2) "the impact of the litigation on the third-party interest." [102]

In *FAIC Securities,* Judge Scalia found the relationship between the deposit brokers and their potential and actual customers sufficient, relying upon the following language in *Craig v. Boren:*

> vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.[103]

Interdictees may be deemed to seek access to the counseling, referral and particularly the legal representation services offered by the HRC. In fact, as pointed out several times previously, the INS refers Haitian refugees in need of assistance of this sort to the HRC.[104]

98. 768 F.2d at 357–61.

99. 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

100. 768 F.2d at 358.

101. *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). Professor Monaghan states that the case law "permits jus tertii standing so long as a sufficient 'relationship' exists between the litigant and an identifiable third party right holder." He further points out that "[w]hat counts as such a relationship now raises difficulties," citing *Eisenstadt v. Baird,* 405 U.S. 438, 445, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972), in which an *advocate* of third-party rights was awarded standing. He concludes that the Court proceeds on a "largely intuitive basis." Monaghan, *supra* note 97, at 309 & n. 171.

102. *Eisenstadt,* 405 U.S. at 445, 92 S.Ct. at 1034.

103. 429 U.S. at 195, 97 S.Ct. at 456.

104. The majority maintains that, because (in its view) the *FAIC Securities* test cannot be reconciled with the result in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), and *California Bankers Association v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), we are free to disregard it. The majority, however, cannot adequately explain *Singleton v. Wulff. Wulff* involved a challenge by physicians of a Medicaid funding scheme that denied payment for abortions that were not medically indicated. The statute did not directly interfere with protected interaction; it only refused to lend state monetary support for such interaction. Yet, the Court allowed the physicians to raise the privacy rights of their patients. It is no explanation that *Wulff* involved an intentional burden on interaction. There is no support in Supreme Court cases that the "intent" of governmental action is a relevant factor in standing analysis.

The conclusion that the relationship between the HRC and the interdictees supports third-party standing is also justified by the Supreme Court's description of the relationship found sufficient to confer standing in *Barrows v. Jackson:*

> [t]he relationship ... between the defendant and those whose rights he sought to assert was not simply the fortuitous connection between a vendor and potential vendees, but the relationship between one who acted to protect the rights of a minority and the minority itself.[105]

The HRC's position is similar. As in *Carey* and *Craig,* the threshold requirement of injury-in-fact to the litigant has been satisfied. Were the Haitian interdictees to arrive in the United States, they would seek the services of the HRC or other organizations of its kind (indeed, it is possible they would be explicitly directed to the HRC by the INS). The general response from the local bar to pleas by the INS for help in matters of Haitian representation was not so overwhelming as to render this eventuality unlikely;[106] and the HRC has stated that over 20,000 Haitian refugees have been represented or otherwise served by its organization.[107] Surely if the relationship between a vendor of beer and a potential customer in *Craig,* or "an advocate of the rights of persons to obtain contraceptives and those desirous of doing so" in *Eisenstadt,*[108] or "one who act[s] to protect the rights of a minority and the minority itself" in *Barrows v. Jackson,*[109] suffices to establish a relationship for purposes of *jus tertii,* so, too, does that of the HRC to its potential clientele. As summarized by a well-known treatise:

> The cumulative weight of these decisions is impressive. A party who has suffered some personal injury is often permitted to assert the rights of others, occasionally even when the injury has

The majority also tries to show that the court in *FAIC Securities* reached the right result for the wrong reason. They maintain that the brokers were not required to satisfy the zone of interests test because they were claiming that the regulations were *ultra vires* the statutes under which they were promulgated. Further, the right asserted—"the right not to be injured by unauthorized agency action—was their own." Under this view of standing, the HRC (or anyone else for that matter who establishes Article III standing) can attack actions alleged to be *ultra vires* a statute absent congressional intent to limit standing.

*Payner* is a case best restricted to its narrow context—*i.e.,* whether a litigant may seek a remedy of exclusion of evidence illegally obtained in the course of a search of the property of another person. The question of the appropriate remedy for a Fourth Amendment violation may well be a unique case in which third-party standing is inappropriate. *See Rakas v. Illinois,* 439 U.S. 128, 137–38, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1979) ("misgivings as to the benefit of enlarging the class of persons who may invoke the rule are properly considered when deciding whether to extend standing to assert Fourth Amendment violations.") Although the underlying rationale is far from clear in *Bankers Association,* it may well be that the Court relied on the unique aspects of Fourth Amendment jurisprudence for its denial of third-party standing. Thus, there is no reason to revamp this circuit's test of third-party standing based on the cases cited by the majority.

*FAIC Securities* represents the law of the circuit and should be applied here unless an alternative test exists that does not conflict with the Supreme Court case law. Because the majority test cannot explain *Wulff,* the *FAIC Securities* test should be applied in this case.

The majority also seems to argue that the HRC must show evidence that Congress "intended to give them a right of action on behalf of the interdicted Haitians." But, such a showing is equivalent to finding that the HRC is within the zones of interests of the statutes. Thus, as I read the majority opinion, third-party standing would only be permissible if the third-party also had first-party standing. This view drains third-party standing of all of its vitality.

**105.** *Eisenstadt,* 405 U.S. at 445, 92 S.Ct. at 1034 (discussing *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)).

**106.** *See HRC v. Smith,* 676 F.2d 1023, 1031 n. 16 (5th Cir.1982) ("Efforts had been made by the INS to secure representation for the Haitians, especially pro bono, in the Miami area. The response it received is an ugly reflection on the commitment with which the bar meets its responsibility to make legal services available to the disadvantaged.").

**107.** *See* Affidavit of Father Gerard Jean-Juste, *supra* note 35, at ¶ 3.

**108.** *Eisenstadt,* 405 U.S. at 445, 92 S.Ct. at 1034.

**109.** *Id.* (discussing the decision in *Barrows*).

been incurred voluntarily ... [i]f there are plausible guarantees of effective advocacy and harmonious interests....[110]

None of the reasons generally offered to limit third-party standing—poor advocacy, the preference of non-parties that their rights go unenforced, a conflict of interest between the litigant and the third-party—exist here. In this case, the advocacy of the HRC is unchallenged, the obstacles to litigation are clear, and the congruence of the interests of the HRC and the interdictees is apparent.[111]

The Government's attacks on this analysis are not convincing. The Supreme Court does *not* require the litigant itself to be subject to a legal penalty or prohibition restricting its interaction with the third party in order to justify *jus tertii* standing;[112] nor does the Court require a relationship with a *specified* third party to exist.[113] In addition, this court has performed the *jus tertii* analysis when only nonconstitutional rights were at stake.[114] Therefore, all of the Governments' objections to *jus tertii* standing are unavailing.

Thus, because the Haitian interdictees are plainly within the relevant zones of interest and because the HRC, having satisfied Article III's requirements, may assert their interests, the organization has standing in the present case.[115]

B. *The Merits of the Claims*[116]

The HRC alleged that the interdiction program violates the Refugee Act and the

110. WRIGHT, MILLER & COOPER, *supra* note 28, § 3531.9, at 585. *See also* Nichol, *Rethinking Standing,* 72 CALIF.L.REV. 68, 97–98 (1984).

Professor Monaghan contends that most third-party standing cases could be better understood in first-party terms: "[t]he litigant is asserting a substantive due process right to interact with a third-party right holder free from unjustifiable governmental interference." He further suggests that the Supreme Court's "current insistence on a special relationship between the litigant and a third party" permits the reformulation of most third-party cases in first-party terms. Monaghan, *supra* note 97, at 282, 307 n. 163. Questions remain in either the "unjustified interference" or the "special relationship" construction—What interference is unjustified? Which relationships are sufficiently special? Professor Monaghan specifically highlights the difficulty of these questions. *See id.* at 309 n. 169 & n. 171. *Eisenstadt* and *Craig,* however, suggest that the Supreme Court has provided broad answers.

111. In *Munson,* 467 U.S. at 958, 104 S.Ct. at 2848, the Court held that a professional fundraising firm had standing to assert the First Amendment rights of its charitable clients in challenging a statute that limited the share of revenues from fundraising events payable as expenses. It stated that "[t]he activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents." The instant case is similar. In addition, unlike the situation in *Warth,* the HRC has alleged "that the challenged ... practices *preclude* or otherwise adversely affect a relationship existing between them and the persons whose rights assertedly are violated." 422 U.S. at 510, 95 S.Ct. at 2211 (emphasis supplied). Thus, there is more than an "incidental congruity of interest" between the HRC and the interdictees.

112. *See Revere,* 463 U.S. at 243, 103 S.Ct. at 2982; *see also* Monaghan, *supra* note 97, at 302–03 and cases cited therein.

113. *See Craig,* 429 U.S. at 194–95, 97 S.Ct. at 455–56.

114. *See FAIC Securities,* 768 F.2d at 357–61; *see also* Albert, *supra* note 53, at 469.

115. We express no view on the HRC's right to assert standing in a *representational* capacity on behalf of its Haitian members. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

116. The Government argues that this court should not reach the merits because the complaint at issue presents nonjusticiable political questions. As two members of this panel have had occasion to point out, the political question doctrine is at best unsettled. *See Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 796 (D.C. Cir.1984) (Edwards, J., concurring), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *id.* at 803 (Bork, J., concurring). This court has recently characterized the doctrine as "narrow." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1514 (D.C.Cir.1984) (en banc), *vacated and remanded on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *see also* Henkin, *Is There a "Political Question" Doctrine?* 85 YALE L.J. 597 (1976). In the area of foreign affairs, some broad challenges to the Executive's conduct of foreign relations have

INA, the Protocol, the due process clause of the Constitution, and the extradition treaty and statute. The District Court, however, found that the program did not contravene these legal provisions and further concluded that the President had both statutory and inherent constitutional authority to initiate the high seas interdiction program.[117]

In significant measure, this court must adopt the conclusions and analyses of the District Court on the merits of this case. In particular, no error can be found in the trial court's disposition of Count One, the claim under the Refugee Act and the INA;[118] Count Four, the claim under the extradition treaty and statute;[119] and the portion of its analysis of Count Three that pertains to the Universal Declaration of Human Rights.[120] It is difficult to quibble with the conclusion of the District Court that the President indubitably possessed both statutory and inherent constitutional authority to establish the interdiction program.[121] However, while the trial court was correct in its conclusion that the claims made pursuant to the Protocol and the due process clause of the Constitution ought to be dismissed, its rationale for these judgments was somewhat questionable. Further amplification on these two points is offered below.

(1) *The Due Process Claim*

The HRC contends that the actions taken by the defendants exceed their constitutional and statutory authority and deprive the interdicted Haitians of their liberty "in violation of standards of due process defined by Congress in the Refugee Act and the Immigration and Nationality Act and *therefore* without due process of law guaranteed by the Fifth Amendment."[122]

As noted above, the interdiction program falls within the constitutional and statutory authority of the Executive, and the rights created by the above-referenced statutes do not extend to aliens unless they are either at a port of entry or within the United States. This due process claim, therefore, amounts to nothing more than a repetition of the failed legal theory of the Refugee Act claim in a different guise. Thus, the District Court did not need to reach the question of the existence of constitutional rights for *excludable aliens.* Nonetheless, the trial court considered the question whether "any claim founded on the Fifth Amendment [would] fail[ ] in this con-

been deemed nonjusticiable on the ground that the formulation of foreign policy is constitutionally committed to the political branches. *See, e.g., Johnson v. Eisentrager,* 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950). It is also plain, however, that not every question of foreign relations is constitutionally prohibited ground for the judiciary. *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 71 L.Ed.2d 663 (1962). The instant case involves nothing more than a determination of whether the interdiction program—itself the creation of an executive order and thus of law, *see Acevedo v. Nassau County, N.Y.,* 500 F.2d 1078, 1084 n. 7 (2d Cir. 1974)—is consistent with the governing statutes and treaties and with the Constitution. In short, there is no "lack of judicially discoverable and manageable standards" to apply. *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710. The appellants here do not challenge a determination left exclusively to executive discretion, but a procedure utilized by the executive pursuant to his constitutional and statutory authority. *See* Proclamation No. 4865, *supra* note 6. The federal courts may review a case such as this one to insure that "the executive departments abide by the legislatively mandated procedures." *International Union of Bricklayers v. Meese,* 761 F.2d 798, 801 (D.C.Cir.1985). Thus, the application of the political question doctrine to bar review of the instant case would be inappropriate.

**117.** We do not read the plaintiffs' complaint to allege a separate "ultra vires" claim against the interdiction program; *i.e.,* they do not contend that the statutory and constitutional powers cited by the President to create the program *themselves* reveal the illegality of his action. Instead, the HRC contends that the program is unlawful as violative of the particular legal standards set forth above.

**118.** *HRC v. Gracey,* 600 F.Supp. 1396, 1403–04 (D.D.C.1985).

**119.** *Id.* at 1406.

**120.** *Id.*

**121.** *Id.* at 1399–400.

**122.** Amended Complaint, *supra* note 2, at ¶ 52 (emphasis supplied).

text."[123] Relying on Supreme Court precedent holding that excludable aliens[124] have no constitutional right to enter the United States[125] and on a recent Eleventh Circuit case to the same effect,[126] the trial court held that excludable aliens have no constitutional rights.

In light of the allegations of the complaint, this constitutional question pertaining to excludable aliens need not have been reached. The portion of the Eleventh Circuit decision leaned upon so heavily by the trial court has not been affirmed by the Supreme Court.[127] In fact, the Court went to great lengths to avoid deciding whether a certain class of excludable aliens (parolees) have a Fifth Amendment right to equal protection, indifferent to the combined urging of the Government and the petitioners[128] that the merits of the constitutional claim be reached. In this case, this court is well-advised to follow that example because the law surrounding the constitutional rights, if any, of excludable aliens is complicated and any conclusion would, of necessity, rest in fine distinctions of immigration status. There is no occasion for us to pursue such an effort in the instant matter.

In decisions not discussed by the trial court, the Second Circuit has suggested that some excludable aliens may, under certain circumstances, invoke the protection of the Constitution.[129] In considering the opinions from the Second and Eleventh Circuits, it is clear that the application of the Fifth Amendment to various categories of excludable aliens is an intricate question involving some uncertainty. While it may well be that interdictees have no constitutional rights, it is unnecessary to reach out to decide this question where the complaint does not require us to do so.

(2) *The Protocol*

The HRC contends that the interdiction program violates Article 33 of the Protocol, a treaty to which the United States acceded in 1968. That article reads as follows:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be

123. *HRC v. Gracey,* 600 F.Supp. at 1405.

124. *Deportable aliens* are those who have entered the United States illegally or those who have entered legally and subsequently lost their legal status. *Excludable aliens* are those who have reached the borders but been stopped prior to entry.

125. *See Kleindienst v. Mandel,* 408 U.S. 753, 765–66, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).

126. *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984), *aff'd in part,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

127. *See* 105 S.Ct. at 2999 ("The fact that the [class members'] protection results from the terms of a regulation or statute, rather than from a constitutional holding, is a necessary consequence of the obligation of all federal courts to avoid constitutional adjudication except where necessary.").

128. As the Supreme Court noted:

> Petitioners contend that the only adequate remedy is "declaratory and injunctive relief" ordered by this Court, based upon the Fifth Amendment.... For its part respondents are also eager to have us reach the Fifth Amendment issue. Respondents wish us to hold that the equal protection component of the Fifth Amendment has no bearing on an unadmitted alien's request for parole.

105 S.Ct. at 2997.

129. *See Yiu Sing Chun v. Sava,* 708 F.2d 869, 876–77 (2d Cir.1983) ("A refugee who has a 'well-founded fear of prosecution' in his homeland has a protectable interest recognized by both treaty and statute, and his interest in not being returned may well enjoy some due process protection not available to an alien claiming only admission."). If some excludable aliens possess due process rights (in *Sing Chun* the alien was a stowaway, a highly disfavored class), so, too, might others. *See also Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984) ("despite the unavailability of due process protections in most exclusion proceedings ... and whether or not due process protections apply to an application for a discretionary grant of asylum, which secures admission to this country ..., it appears likely that some due process protection surrounds the determination of whether an alien has sufficiently shown that return to a particular country will jeopardize his life or freedom so as to invoke the mandatory prohibition against his return to that country").

threatened on account of his race, religion, nationality, membership in a particular social group or political opinion. The District Court held that the Protocol was not self-executing, *i.e.*, that it could not form the basis of a legal claim without legislative action, and that, as partially executed through the Refugee Act, it provided no rights to aliens on the high seas. We need not decide the complex question of Article 33's self-executory nature; it is enough for us to rely on the ground that Article 33 in and of itself provides no rights to aliens outside a host country's borders.

The Protocol binds acceding parties to comply with the provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees.[130] The negotiating history of this convention reveals that delegates to the Conference of Plenipotentiaries at which it was adopted considered and rejected the argument presented here by the HRC—that Article 33 prohibits a contracting state from returning a refugee to a country in which he or she would be endangered. They did so by agreeing that "expulsion" would refer to a "refugee already admitted into a country" and that "return" would refer to a "refugee already within the territory but not yet resident there." [131] Thus, the Protocol was not intended to govern parties' conduct outside of their national borders.[132]

The delegates further agreed that the "possibility of mass migrations across frontiers or of attempted mass migrations was not covered by article 33." [133] The interdiction program is specifically directed against the "illegal migration by sea of large numbers of undocumented aliens." [134] As such, it falls beyond the reach of the Article 33 obligation.

Ironically, the Refugee Act, which amended the INA, "basically conforming it to the language of Art. 33 of the United Nations Protocol," [135] is broader in scope

**130.** 189 U.N.T.S. 150 (July 28, 1951). The United States is not a signatory to the Convention itself.

**131.** Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Thirty-fifth Meeting, U.N.Doc. A/Conf. 2/Sr. 35, at 21 (July 25, 1951).

**132.** Commentators appear to be in accord with this view. *See* Aga Khan, *Legal Problems Relating to Refugees and Displaced Persons,* 149 Recueil Des Cours (Hague Academy of International Law) 287, 318 (1976); Weis, *The United Nations Declaration on Territorial Asylum,* 7 Can.Y. Int'l L. 92, 123–24 (1969); Note, *The Right of Asylum Under United States Law,* 80 Colum.L. Rev. 1125, 1126–27 (1980).

**133.** The relevant discussion on the scope of Article 33 at the second and final reading of the draft Convention which took place on July 25, 1951, was as follows:

> Baron van BOETZELAER (Netherlands) recalled that at the first reading [U.N.Doc. A/Conf. 2/Sr. 16, at 6 (July 11, 1951) ] the Swiss representative had expressed the opinion that the word "expulsion" related to a refugee already admitted into a country, whereas the word "return" (*"refoulment"*) related to a refugee already within the territory but not yet resident there. According to that interpretation, article 28 would not have involved any obligations in the possible case of mass migrations across frontiers or of attempted mass migrations.
>
> He wished to revert to that point, because the Netherlands Government attached very great importance to the scope of the provision now contained in article 33. The Netherlands could not accept any legal obligations in respect of large groups of refugees seeking access to its territory.
>
> At the first reading the representatives of Belgium, the Federal Republic of Germany, Italy, the Netherlands and Sweden had supported the Swiss interpretation. From conversations he had since had with other representatives, he had gathered that the general consensus of opinion was in favour of the Swiss interpretation.
>
> In order to dispel any possible ambiguity and to reassure his Government, he wished to have it placed on record that the Conference was in agreement with the interpretation that the possibility of mass migrations across frontiers or of attempted mass migrations was not covered by article 33.
>
> There being no objection, the PRESIDENT [of the Conference of Plenipotentiaries] *ruled* that the interpretation given by the Netherlands representative should be placed on record.

U.N.Doc. A/Conf. 2/Sr. 35, at 21 (emphasis in original).

**134.** Proclamation No. 4865, *supra* note 6.

**135.** *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984).

than the Protocol. That statute now provides:

> The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(19)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h) (1982). This section applies to aliens in exclusion and deportation proceedings.[136] Thus, section 1253(h), applying as it does both to aliens seeking entry and to aliens within the United States, is actually more generous than is required by the Protocol. Under these circumstances the debate about self-execution is irrelevant.

The other best evidence of the meaning of the Protocol may be found in the United States' understanding of it at the time of accession. There can be no doubt that the Executive and the Senate decisions to adhere were made in the belief that the Protocol worked no substantive change in existing immigration law.[137] At that time "[t]he relief authorized by § 243(h) [8 U.S.C. § 1253(h)] was not ... available to aliens at the border seeking refuge in the United States due to persecution."[138] The Supreme Court has explained that at the time of accession

> [t]here were of course differences between the Protocol and the text of domestic law. The most significant difference was that Art. 33 gave the refugee an entitlement to avoid deportation to a country in which his life or freedom would be threatened, whereas domestic law merely provided the Attorney General with discretion to grant withholding of deportation on grounds of persecution. *The Attorney General, however, could naturally accommodate the Protocol simply by exercising his discretion to*

*grant such relief in each case in which the required showing was made....*[139]

The effect of the subsequent adoption of the Refugee Act was to eliminate the textual existence of the above-mentioned discretion; there was no congressional intent at the moment of adherence or upon the enactment of the Refugee Act to substantively alter existing law, which had protected only aliens inside the United States.

In short, it seems clear that the Haitian interdictees are not protected by the Protocol. The negotiating history of the Convention it incorporates leads inescapably to the conclusion that certain compromises were essential to agreement and that the ideal of unconditional asylum was diluted by the need for other practical guarantees. Admittedly, this outcome may be harsh and, in individual cases, may result in genuine hardship or suffering; but no other decision would be defensible in light of the explicit terms of the Protocol and its legislative history.

## III. CONCLUSION

This case presents a painfully common situation in which desperate people, convinced that they can no longer remain in their homeland, take desperate measures to escape. Although the human crisis is compelling, there is no solution to be found in a judicial remedy. The stark reality here is that, pursuant to the allegations of the amended complaint, this court is constrained to conclude that the HRC has not alleged a claim upon which relief can be granted.

---

136. *See, e.g.,* 8 C.F.R. § 208.3 (1985).

137. *See INS v. Stevic,* 104 S.Ct. at 2494–95.

138. *Id.* at 2493.

139. *Id.* at 2500 n. 22 (emphasis supplied).